**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Ricardo Luis ROMERO, Alexander Steinwachs, Defendants-Appellants.**

No. 85–5309.

United States Court of Appeals,
Eleventh Circuit.

Jan. 24, 1986.

---

H. Dohn Williams, Jr., Ft. Lauderdale, Fla., for defendants-appellants.

John F. Evans, G. Richard Strafer, Coral Gables, Fla., for Steinwachs.

Stanley Marcus, U.S. Atty., Vince Alto, Linda Collins Hertz, Thomas A.W. Fitzgerald, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before JOHNSON and HENDERSON, Circuit Judges, and ALLGOOD *, Senior District Judge.

HENDERSON, Circuit Judge:

Ricardo Romero and Alexander Steinwachs appeal their convictions in the United States District Court for the Southern District of Florida for conspiring to possess with intent to distribute cocaine in excess of one kilogram in violation of 21 U.S.C. § 846, and possession with intent to distribute cocaine in excess of one kilogram, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. After a review of the briefs and the record, we affirm Romero's conviction and reverse the conviction of Steinwachs.

Romero and Steinwachs were employees of World Tropical, a company jointly owned by Edwin Golstein, its general manager in the United States, and the Orajales family who reside in Colombia. World Tropical purportedly processes and distributes fruit juice. According to a government witness, Steinwachs "worked by words from" Romero. Steinwachs worked "in the back" while Romero "was in charge of a lot of things." Record on Appeal, Vol. III at 160. According to Golstein, Romero was a "plant superintendent" and Steinwachs

---

* Honorable Clarence W. Allgood, Senior U.S. District Judge for the Northern District of Alabama, sitting by designation.

was a "machine operator." Record on Appeal, Vol. IV at 350–351.

On October 24, 1984, an Avianca cargo plane arrived at the Miami airport with a cargo of 260 barrels presumably containing frozen fruit juice from Colombia. Officers of the United States Customs Service discovered, through the use of a metal probe, that some of the barrels contained cocaine. The agents resealed the barrels and alerted a drug task force which set up surveillance of the barrels.

At 1:00 p.m. on October 24, 1984, the trailers containing the barrels were moved to a cold storage facility owned by JES Trading Company (JES). At 10:00 a.m. the following morning, two employees of JES began unloading the trailers and placing the barrels inside the building. Steinwachs arrived at JES around 1:00 p.m. and assisted in the unloading. As he removed the drums, Steinwachs looked for and isolated those barrels numbered in the "24,000 series." Another JES employee, Andres Esguerra, testified that Steinwachs "had been told" to remove these drums. Record on Appeal, Vol. III at 168.

At about 6:00 p.m., the 24,000 series barrels and 10 other smaller kegs were loaded into a truck belonging to World Tropical. Romero had previously arrived at JES in a Datsun automobile registered to World Tropical. Carlos Clavijo, another JES employee, drove the truck to a World Tropical warehouse with Romero following in the Datsun. Steinwachs remained behind to finish loading the barrels into the freezer. After unloading the drums at World Tropical, Romero and Clavijo returned to JES.

Earlier in the day, Steinwachs promised Clavijo that he would give him a ride home in his Chevrolet Blazer because Clavijo's car was being repaired. Upon learning about this accommodation after returning to JES with Clavijo, Romero became angry and told Clavijo that he would have to find another way to get home.[1] All three men then returned to World Tropical. Clavijo called his brother to take him home and Romero and Steinwachs stayed at World Tropical to close up the office.

Romero left World Tropical at 9:04 p.m. to make a phone call from a local gas station. While Romero was gone, Steinwachs was observed "pacing back and forth, looking at the Blazer, looking at the dock area and waiting." Record on Appeal, Vol. III at 226.

Romero returned to World Tropical at 9:15 p.m. During the next few minutes, Romero and Steinwachs turned the office lights on and off repeatedly and opened the blinds four or five times. Then, they left World Tropical in the Datsun after placing some small bags in the car. They were stopped by federal agents and returned to the warehouse.

At the warehouse, the agents found five empty 55–gallon drums numbered in the 24,000 series which had been completely hosed down. In the back of the Blazer, they found five smaller barrels each containing about 105 pounds of cocaine. The agents also searched the World Tropical office and found an anti-bugging device, $1,400.00 in cash in a pair of Steinwachs' jeans and a vial with traces of cocaine in Steinwachs' shoulder bag.

The appellants were convicted after a jury trial. Both men were represented by the same attorney, who had also represented Edwin Golstein. Because the appellants raise different issues on appeal, we will address the claims of each appellant separately.

### I. *Romero*

Romero first claims that the district court abused its discretion by adopting a rotating method for the exercise of preemptory challenges. The court established a novel procedure for the use of peremptory challenges which included six rounds. In the first four rounds, the defendants were permitted two strikes in each round and the government one, with the defense challenging first, then the government, then the

---

1. Romero told Steinwachs that they were supposed to help Romero's sister move that night and therefore Steinwachs could not furnish Clavijo a ride home.

defense so alternating until twelve strikes were exhausted, eight for the defendants and four for the government. Both sides had one challenge each in the fifth and sixth rounds with the government exercising its challenge first in the fifth round and second in the sixth round. A challenge not exercised in each round was lost but remaining challenges could be used against any juror during any of the rounds.

Romero argues that this procedure was arbitrary and capricious because it denied the defendants the ten peremptory challenges allotted by Fed.R.Crim.P. 24(b).[2] He also contends that the district court violated Rule 24(b) by allowing the government to have the final challenge in the last round.

 The standard of review governing the distribution of peremptory challenges is whether the procedure employed constituted an abuse of the district court's discretion in supervising the selection of jurors. *See United States v. Bryant*, 671 F.2d 450, 455 (11th Cir.1982). Romero has not cited a single case to support his argument that the procedure established in this case was arbitrary or capricious. Although he claims that he was denied his full complement of peremptory challenges, the record discloses that the defendants exercised all ten of the challenges allotted them by Rule 24(b). Record on Appeal, Vol. I at 33, 38, 41–42, 49, 52, 59–60. And, contrary to Romero's assertions, this rule does not mandate that a defendant be allowed to exercise the final peremptory challenge. Romero simply has failed to demonstrate that the rotating method used by the district court for the exercise of peremptory challenges impaired his right to exercise those challenges.

 Romero next urges that the prosecution failed to prove beyond a reasonable doubt that he possessed the requisite felo-nious intent for possession with intent to distribute cocaine and conspiracy to distribute cocaine. The evidence adduced at trial, however, was clearly sufficient to support Romero's conviction. The government established that Romero had direct, sustained contact with the hidden kegs of cocaine. Furthermore, he made repeated phone calls to a JES employee to secure early transfer of the barrels containing the cocaine and seemed "impatient" during the conversations. Record on Appeal, Vol. III at 165. The jury could also have reasonably disbelieved Romero's story that he did not know that the barrels contained cocaine until he opened them and that he planned to deposit the contraband at a neutral site and call the authorities. We find that there was sufficient evidence to support the jury's finding of felonious intent.[3]

## II. *Steinwachs*

Steinwachs asserts several assignments of error including the claim that the district court did not conduct an appropriate Fed.R. Crim.P. 44(c) inquiry and that his trial attorney labored under an actual conflict of interest. Because we agree with Steinwachs that these errors mandate reversal of his conviction, we do not reach the other issues raised by him.

Fed.R.Crim.P. 44(c) provides:

Whenever two or more defendants have been jointly charged pursuant to Rule 8(b) or have been joined for trial pursuant to Rule 13, and are represented by the same retained or assigned counsel ..., the court shall promptly inquire with respect to such joint representation *and shall personally advise each defendant of his right to the effective assistance of counsel, including separate representation.* Unless it appear that there is good cause to believe no conflict of interest is likely to arise, the court shall take such

---

2. Fed.R.Crim.P. 24(b) states in pertinent part: If the offense charged is punishable by imprisonment for more than one year the government is entitled to 6 peremptory challenges and the defendant or defendants jointly to 10 peremptory challenges.

3. Romero does not argue that the jury was improperly charged on the issue of felonious intent.

measures as may be appropriate to protect each defendant's right to counsel. (emphasis added).

 This rule requires the district court to make a "probing inquiry" into the nature of a potential conflict of interest and to "specifically advise defendants of their right to separate representation." *United States v. Mers*, 701 F.2d 1321, 1326 (11th Cir.1983). A technical violation of this rule, however, will not lead to reversal in every case. A defendant must demonstrate the existence of an actual conflict of interest before he is entitled to a reversal of his conviction. *Id.* at 1326–27. *See also United States v. Carter*, 721 F.2d 1514, 1536–37 (11th Cir.1984).

 Steinwachs claims that the district court never fully apprised him of the facts underlying the alleged conflict of interest or that he had a right to separate counsel. The government, on the other hand, contends that the district court met its Rule 44(c) obligations by pointing out the potential conflict of interest on three different occasions. The record, however, supports Steinwachs' position.

The first significant discussion between the district court and Steinwachs concerning a potential conflict of interest occurred on the first day of trial.[4] The trial judge discussed at length the possible conflicts inherent in a joint representation and asked both defense counsel and the prosecution if they perceived any potential conflicts. He also asked the defendant's attorney if he had discussed the matter with his clients. The lawyer answered as follows:

> I've gone over all of the testimony with them, Judge. I haven't gone into specific detail on a conflict situation. They're aware of what's involved. Their testimony is identical on all aspects of the case. They're either both guilty or they are both innocent.

Record on Appeal, Vol. III at 4.

Following this response, the judge asked each defendant if they were satisfied that

there was no conflict of interest. Both answered that they were satisfied and that they wanted their trial attorney to represent them.

Although the court discussed the possible conflict of interest problems with Steinwachs, he failed to specifically advise him that he had the right to separate counsel. This omission violates the clear wording of Rule 44(c). *See Carter, supra,* at 1536.

After the closing arguments, the trial judge again inquired of both defendants if they believed that their attorney labored under any conflicts of interest. Both men replied "no" and told the judge that they felt they had been adequately represented by their attorney. Once again, however, Steinwachs was not advised that he had the right to separate counsel.

Steinwachs also maintains that he was never informed in detail as to his attorney's conflict of interest. He says that had it not been for the joint representation, he could have pursued a "shifting blame" defense by arguing that Romero and World Tropical were responsible for the cocaine and that he (Steinwachs) was merely a low level employee with no prior knowledge that the barrels contained cocaine. He claims that the unified defense theory pursued by the attorney was prejudicial because there was considerably more evidence against Romero than against him. Moreover, it was revealed during the trial that his lawyer also represented Edwin Golstein in various civil matters and as a representative of World Tropical in a forfeiture action related to this case. Steinwachs reasons that this dual representation created an actual conflict of interest with consequences that were never discussed with him.

Although the trial judge made efforts to inform Steinwachs of the potential conflict of interest, we hold that these efforts do not satisfy the dictates of Rule 44(c). Steinwachs was never told that he had a right to independent counsel and he was never

---

**4.** The district court first mentioned the problem during arraignment but did not pursue it further.

informed of the specific facts and possible consequences of the dual representation. Without being aware of these facts, Steinwachs was unable to make a knowing decision whether to retain his trial attorney despite the potential conflicts of interest.[5]

■ Having concluded that the trial judge did not comply with Rule 44(c), we must now determine whether Steinwachs has proven that his attorney labored under an actual conflict of interest. We will not find such a conflict unless the defendant "can point to specific instances in the record to suggest an actual conflict of interest." *United States v. Mers*, 701 F.2d 1321, 1328 (11th Cir.1983). A mere hypothetical conflict will not suffice. Rather, Steinwachs must make a factual showing of "inconsistent interests and must demonstrate that the attorney made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other." *Id.* at 1328.

To support his allegation that his lawyer actually labored under a conflict of interest, Steinwachs maintains that the attorney could not have pursued a "shifting blame" defense without infringing upon the rights and interests of Romero, Golstein and World Tropical. The "failure to adopt a strategy of shifting blame may well give rise to an actual conflict of interest, but to do so the strategy must have been an option realistically available to trial counsel." *Carter, supra,* at 1537. In the present

case, the evidence discloses that Romero held a managerial position in World Tropical whereas Steinwachs was merely a truck driver and machine operator. Record on Appeal, Vol. III at 350–351. According to the government's own witness, Steinwachs "worked by words from" Romero. *Id.* at 160. Furthermore, on the day the barrels of cocaine arrived from Colombia, Romero made several phone calls to JES to check on the barrels while Steinwachs testified that he did not learn about the shipment until an hour before its arrival.[6] Based on these facts, Steinwachs urges that a shifting blame defense was not only "realistically available" but was the best defense available to him.

Steinwachs' defense counsel's simultaneous representation of Romero, Steinwachs and Golstein [7] made it impossible for him to pursue a shifting blame defense. It also precluded a successful examination of Golstein who testified that he had no knowledge of the cocaine. We agree that Steinwachs' status as a low level employee made a shifting blame defense extremely feasible and that such a defense was completely foreclosed to him because it would have implicated his codefendant and another client of his attorney.

Steinwachs also points to other examples in the record where his attorney's performance was hindered by his conflict of interest. For example, the anti-bugging device found at World Tropical was admitted into evidence *solely* on the basis of Romero's managerial position at World Tropical. De-

---

5. The government relies on *United States v. Petz,* 764 F.2d 1390, (11th Cir.1985) to support its argument that this issue should be decided in a collateral proceeding. *Petz* is clearly distinguishable from the present case. In *Petz,* the court found that although the defendant was never specifically advised of his right to counsel, the record contained "strong inferences that [the defendant] ... did in fact make a knowing and intelligent waiver." The present record contains no such inferences. Furthermore, the court in *Petz* analyzed the case under the dictates of the decision in *United States v. Garcia,* 517 F.2d 272 (5th Cir.1975), and never mentioned Rule 44(c) or the standards for reversal articulated in *Carter.* To the extent that the government is claiming that a collateral hearing is necessary to determine whether Steinwachs

waived his right to separate representation, we hold that, on the present facts, the trial court's clear failure to meet the Rule 44(c) requirements negates any such argument.

6. There is no evidence in the record to contradict this testimony.

7. The government's argument that the joint representation is not clear from the record is without merit. Steinwachs' attorney stated on the record that he had represented Golstein on various civil matters and there is a pleading in the record filed by Steinwachs' attorney stating that he is acting on behalf of "Edwin Golstein as Representative of World Tropical." Record on Appeal, Vol. I at 115–116, Vol. V at 561.

fense counsel, however, failed to object to its introduction against Steinwachs and even failed to seek an instruction limiting the evidence to Romero. This failure is easily explained by the attorney's approach to this case that the defendants were either "both guilty or they're both innocent." Record on Appeal, Vol. III at 4.

The conflict also manifested itself at the sentencing stage of the trial. Had there been no such conflict, Steinwachs' attorney could have argued Romero's greater involvement in the events leading up to the arrest and emphasized Steinwachs' relatively minor role in those events. He was unable to present such an argument, however,. in light of his obligations to Romero.

For the foregoing reasons, we find there was an actual conflict of interest inherent in the dual representation. Because of this conflict, and the district court's failure to comply with the dictates of Fed.R.Crim.P. 44(c), Steinwachs' conviction must be reversed and the case remanded for a new trial.

Accordingly, we AFFIRM Romero's conviction and REVERSE Steinwachs' conviction.