Betty S. FITZGERALD, Appellant,

v.

UNITED STATES, Appellee.

Renee S. FITZGERALD, Appellant,

v.

UNITED STATES, Appellee.

Nos. 85–393, 85–1332.

District of Columbia Court of Appeals.

Argued May 12, 1987.
Decided Aug. 24, 1987.

Paul F. Kemp, Rockville, Md., for appellants.

Michael D. Brittin, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., and Michael W. Farrell and Roxanne N. Sokolove, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before NEWMAN, TERRY and STEADMAN, Associate Judges.

NEWMAN, Associate Judge:

After joint trial by jury, Betty and Renee Fitzgerald were each convicted on one count of possession with intent to distribute heroin, six counts of possession of an unregistered firearm, and four counts of unlawful possession of ammunition. Having both been represented at trial by the same attorney, their principal contention on appeal is that they were deprived of their right to effective assistance of counsel because (a) they did not knowingly and intelligently waive their right to representation free from conflicts of interest, and (b) their joint attorney's performance· at trial was adversely affected by an actual conflict of interest.

At issue in particular is the extent to which a trial court is required, under Super.Ct.Crim R. 44(b) and our prior holding in *Douglas v. United States*, 488 A.2d 121 (D.C.1985), to explain to jointly represented defendants their right to separate counsel, in order that their waiver of that right may be deemed to be "intelligent and competent." *Johnson v. Zerbst*, 304 U.S. 458, 465, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). We hold that Betty and Renee Fitzgerald were not adequately informed by the trial court of their right to separate counsel. We also conclude that their representation at trial was adversely affected by an actual conflict of interest. *Cuyler v. Sullivan*, 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980). Accordingly, we reverse.[1]

---

1. The Fitzgeralds also request reversal based upon two allegedly erroneous jury instructions, and the insufficiency of the evidence supporting their convictions. We reject their claim of evidentiary insufficiency; we do not reach their claims as to the jury instructions.

## I

Evidence adduced by the government at trial showed that on September 15, 1983, Sergeant Larry Brillhart led a team of officers of the Metropolitan Police Narcotics Task Force to an apartment located on W Street, Northwest, to execute a search pursuant to a warrant obtained earlier that day. Brillhart knocked on the door and announced his presence. He heard shuffling noises coming from inside the apartment, but nobody answered the door. He ordered the door broken in.

The door opened directly into the living room. Upon entering, the police found Betty Fitzgerald standing two or three feet from a couch. No one else was in the apartment. After Brillhart advised her that he had a search warrant, the officers commenced their search. During the course of the search Renee Fitzgerald arrived with a male companion. Betty identified Renee as her sister. Both women stated that they lived in that apartment.

The apartment consisted of three bedrooms, a kitchen and a living room. In the living room, police found two bundles of heroin on the floor behind the couch near which Betty Fitzgerald had stood when the police entered. The bundles contained a total of eleven packets of heroin, packaged for distribution rather than for personal use. These bundles were not in plain view. At no time was Betty Fitzgerald seen crouching down or even looking behind the couch.

In the closet and dresser of one bedroom, designated bedroom no. 1 at trial, police found a loaded .22 caliber pistol, nine rounds of .32 caliber ammunition, a holster, and currency amounting to $983.[2] Also seized were papers belonging to both Betty and Renee Fitzgerald. In bedroom no. 3, police found five handguns with ammunition and a woman's clothes in a closet, cosmetics and perfume, and papers and a voter registration card bearing Renee Fitzgerald's name in a dresser drawer. A drawer in bedroom no. 2 contained assorted ammunition, and thirty-three rounds of ammunition were found in a kitchen cabinet.

The two sisters were arrested and "processed" by different officers. Betty Fitzgerald was processed by Officer Campagne, to whom she gave as her address the W Street apartment. Renee Fitzgerald was processed by Officer Sheely, who testified that she likewise gave the W Street address and telephone number as her own.

Teddie Harris, an employee of the Department of Human Services (DHS), testified for the government that Renee Fitzgerald had applied for welfare in January, 1983; her application indicated that she lived at the W Street apartment. Harris also testified that welfare recipients are required to notify DHS of a change of address, and that DHS records did not contain a notification of change of address respecting Renee Fitzgerald, nor did they indicate any problems in the delivery of checks to her.

Detective Johnnie St. Valentine Brown testified for the government as an expert on narcotics trafficking, among other things. He explained that drug distribution often involved a "safe house", a place in which drugs are housed or packaged before sale and in which the proceeds of sales may also be kept. The occupants of a safe house are charged with the security of the stored drugs and/or money, and for this purpose, guns are often kept on the premises.

Betty Fitzgerald testified in her own defense that she lived at the W Street apartment on the date of the search, along with her mother, her sister Renee's one-year-old son, and Derrick Johnson, to whom she was later married. She occupied bedroom no. 1 (wherein one gun and ammunition were found by police). Her mother, who was frequently away from home visiting her sick father in Virginia, occupied bedroom no. 2 when she was home. Her sister Renee had occupied bedroom no. 3 (wherein

---

**2.** There was conflicting testimony as to where the $983 was found. The police detective who supervised the collection of evidence at the apartment testified that this amount of currency was found in bedroom no. 1. The testimony of another officer who was in charge of searching bedroom no. 3, however, seemed to indicate that the money was found in that bedroom.

five guns and ammunition were found), but Renee had moved to her other sister Annette's apartment on Taylor Street, N.E. by the time of the search. Renee Fitzgerald continued to visit the W Street apartment regularly, occasionally staying in her old bedroom.

Betty Fitzgerald testified that the night before the search, Abraham Aston, Derrick Johnson's friend (and Renee Fitzgerald's boyfriend), had stayed at the apartment (without Renee). He had arrived at night carrying a brown bag, had slept in bedroom no. 3, and had left in the morning. Betty Fitzgerald suggested that "[h]e could have [brought the guns into the apartment]. He had a bag in his hand. I assume they were clothing."

On the day of the search, Betty Fitzgerald was home alone, washing the dishes, when she heard banging on the door. She ran to the living room, and found the police already inside the apartment. She denied any knowledge about the drugs, guns or ammunition found in the apartment.

Renee Fitzgerald testified that she had lived in the W Street apartment for nine years until June, 1983 (three months before the search), when she moved in with her sister Annette Fitzgerald on Taylor Street. She stated that she had a key to the W Street apartment, and visited there "on a day-to-day basis." She still had some clothes, personal papers and cosmetics in bedroom no. 3, and had access to the full apartment. She had not been there, however, for several days prior to the day of the search.

On the day of the search, Renee Fitzgerald received a phone call at home, and took a cab to the W Street apartment. Upon her arrival there, she was escorted in, arrested, and searched. At trial, she denied any knowledge of the heroin, guns, or ammunition. She also denied having told the police after her arrest that she lived at the W Street apartment.

Peggy Fitzgerald, Betty's and Renee's mother, and Annette Fitzgerald, their sister, corroborated appellants' testimony that

Renee had moved to Taylor Street during the summer of 1983.

## II

◼ The Fitzgeralds' primary contention on appeal is that they did not receive effective assistance of counsel because they were denied their right to be represented by separate attorneys. They assert that although the trial court conducted some pretrial discussion into this matter, they did not during this discussion knowingly and voluntarily waive their right to representation free from conflicts of interest. Moreover, they argue that their joint attorney's performance was, in fact, adversely affected by conflicts of interest which arose at trial.

Encompassed within the Sixth Amendment's guarantee of effective assistance of counsel [3] is the right to representation by counsel whose loyalty is undiluted by conflicts of interest. *Wood v. Georgia*, 450 U.S. 261, 271, 101 S.Ct. 1097, 1103, 67 L.Ed.2d 220 (1981); *Holloway v. Arkansas*, 435 U.S. 475, 481, 98 S.Ct. 1173, 1177, 55 L.Ed.2d 426 (1978); *Douglas, supra*, 488 A.2d at 136. Threats to this right most commonly occur when a single attorney represents multiple defendants with conflicting interests. In such cases, an attorney may forego efforts he would ordinarily undertake on behalf of one client, in order that the other client may not thereby be harmed. For example, an attorney may refrain from challenging the admission of evidence prejudicial to one client but favorable to another, or from emphasizing the culpability of one client in order to exculpate another, or from allowing one defendant to testify against another, or from presenting a defense that helps one client but harms another, or from entering a plea agreement for one client conditioned upon his testimony for the prosecution against another client. *See Holloway, supra*, 435 U.S. at 490, 98 S.Ct. at 1181; *United States v. Curcio*, 680 F.2d 881, 887 (2d Cir.1982); *Campbell v. United States*, 122 U.S.App.

---

**3.** The Sixth Amendment provides, in pertinent part: "In all criminal prosecutions, the accused

shall enjoy the right ... to have the Assistance of Counsel for his defence."

D.C. 143, 145 n. 3, 352 F.2d 359, 361 n. 3 (1965).

The right to conflict-free representation, like other constitutional rights, may be waived by a defendant who wishes to be represented by a particular attorney, though that attorney is burdened by a conflict of interest. *Holloway, supra,* 435 U.S. at 483 n. 5, 98 S.Ct. at 1178 n. 5; *Douglas, supra,* 488 A.2d at 137. Indeed, we have recognized that the prerogative of waiving the right to conflict-free representation is itself buttressed by another Sixth Amendment protection: the right to retain counsel of one's choice. *Douglas, supra,* 488 A.2d at 140–41; *see also Lewis v. United States,* 430 A.2d 528, 531 (D.C.) (Newman, J., dissenting), *cert. denied,* 454 U.S. 1081, 102 S.Ct. 635, 70 L.Ed.2d 615 (1981). "[T]he choice as to which right shall take precedence must be left to the defendant, *properly informed of that choice." Douglas, supra,* 488 A.2d at 144 (emphasis supplied).

■ In cases in which two or more co-defendants are represented by the same attorney, Super.Ct.Crim.R. 44(b) requires the trial court to conduct an inquiry in which

the Court shall promptly inquire with respect to such joint representation and shall personally advise each defendant of his right to the effective assistance of counsel, including separate representation. Unless it appears that there is good cause to believe no conflict of interest is likely to arise, the Court shall take such measures as may be appropriate to protect each defendant's right to counsel.

Although the inquiry embodied in Rule 44(b) is not constitutionally mandated, *see Cuyler, supra,* 446 U.S. at 348, 100 S.Ct. at 1718, the rule was adopted as a means to assure that criminal defendants are not deprived of their constitutional right to the effective assistance of counsel. Fed.R. Crim.P. 44(c) Advisory Committee Note, 77 F.R.D. 507, 594 (1979 amendment).[4] The Rule does not specify what measures the court must take to protect the defendant's

right to conflict-free counsel, leaving this instead within the court's discretion. One obvious course of action, however, is to obtain a waiver. *Id.* at 600.

■ The requirements of a valid waiver obtained during a Rule 44 inquiry are set out in the Rule itself, its accompanying Advisory Committee Note, and federal decisions interpreting the Rule, as well as our decision in *Douglas, supra,* which concerned waivers of this right generally. To begin with, of course, a waiver of the right to conflict-free representation, like waivers of other constitutional rights, "not only must be voluntary but must be [a] knowing, intelligent act[ ] done with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States,* 397 U.S. 742, 748, 90 S.Ct. 1463, 1469, 25 L.Ed.2d 747 (1970) (footnote omitted); *see also Johnson v. Zerbst, supra,* 304 U.S. at 465, 58 S.Ct. at 1023. To this end, before accepting a waiver, the court must conduct an inquiry on the record, *Douglas, supra,* 488 A.2d at 138, personally addressing each defendant, as the Rule provides. *United States v. Mers,* 701 F.2d 1321, 1325 (11th Cir.), *cert. denied,* 464 U.S. 991, 104 S.Ct. 482, 78 L.Ed.2d 679 (1983).

■ "The first task of the trial court is to alert the defendants to the substance of the dangers of representation by an attorney having divided loyalties in as much detail as the court's experience and its knowledge of the case will permit." *Curcio, supra,* 680 F.2d at 888. *See Douglas, supra,* 488 A.2d at 138; Advisory Committee Note, *supra,* 77 F.R.D. at 600; *Mers, supra,* 701 F.2d at 1325; *United States v. Garcia,* 517 F.2d 272, 278 (5th Cir.1975). Although the court is not in a position to know exactly how a conflict of interest might manifest itself at trial, it can apprise the defendant of some of the "garden variety" conflicts that tend to arise from joint representation. *See, e.g., United States v. Bradshaw,* 719 F.2d 907, 912 (7th Cir.1983). A brief inquiry directed to

---

**4.** Super.Ct.Crim.R. 44(b), adopted in 1983, is identical to Rule 44(c) of the Federal Rules of Criminal Procedure.

counsel into the general nature of the defenses may permit the court to more fully define possible conflicts for the defendants. Each defendant should be asked if he has discussed the matter with his attorney, and should be given an opportunity, if he so desires, to consult with independent outside counsel. *Douglas, supra,* 488 A.2d at 138 n. 19; Advisory Committee Note, *supra,* 77 F.R.D. at 601; *United States v. Akinseye,* 802 F.2d 740, 745 (4th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 3190, 96 L.Ed.2d 678 (1987); *Garcia, supra,* 517 F.2d at 278.

▮ Each defendant must be specifically informed that he has a right to be represented by separate counsel, *Douglas, supra,* 488 A.2d at 138; *United States v. Romero,* 780 F.2d 981, 985 (11th Cir.1986), and that an attorney will be appointed by the court if he cannot afford one. *Campbell, supra,* 122 U.S.App.D.C. at 144, 352 F.2d at 360. The court must also insure that the defendant understands the consequences of waiving this right—that "if convicted, he or she will not be able to complain on appeal that the defense at trial was compromised by the conflict." *Douglas, supra,* 488 A.2d at 138.

▮ The defendant must be free to question the court on these issues. Advisory Committee Note, *supra,* 77 F.R.D. at 600–01; *Garcia, supra,* 517 F.2d at 278. As a means of assessing each defendant's comprehension of the dangers of joint representation and the risks of waiver, "questions designed to elicit from the defendant a narrative statement of his understanding are preferable to questions desiged to elicit mere 'yes' or 'no' answers." *Curcio, supra,* 680 F.2d at 889; *see also* Advisory Committee Note, *supra,* 77 F.R.D. at 601 ("Mere assent in response to a series of questions from the bench may in some circumstances constitute an adequate waiver, but the court should nonetheless endeavor to have each defendant personally articulate in detail his intent to forego this significant constitutional protection.") (citing *Garcia, supra,* 517 F.2d at 278).

▮ If, as a result of the inquiry, the trial court determines that each defendant

understands the pitfalls of joint representation and the risks of waiver, *Douglas, supra,* 488 A.2d at 138, and that he has the capacity for making a rational decision, *id.* at 138 n. 19; *Curcio, supra,* 680 F.2d at 888, and if, furthermore, each defendant states his desire to hazard those pitfalls and risks in "clear, unequivocal, and unambiguous language," *Douglas, supra,* 488 A.2d at 139, his waiver may be regarded by the trial court as knowing and intelligent. *Id.; Curcio, supra,* 680 F.2d at 888–89; *Garcia, supra,* 517 F.2d at 278.

### III

▮ We turn now from what the trial court should do before accepting a waiver in a Rule 44 inquiry, to what was done in this case. The subject of possible conflicts of interest was first raised by the trial court on April 25, 1984, the originally scheduled trial date. On that occasion, the court asked defense counsel, "You know I believe the court rules require me to make an inquiry whether there is any conflicting interest.... You feel there would be any conflict in you representing both of them?" Defense counsel responded, "No, Your Honor, the one defense does not in any way conflict with the other," and proceeded to outline for the judge the general nature of the defenses. The court did not on that occasion address either Betty or Renee Fitzgerald. Trial was continued, for reasons which need not concern us here.

On the morning of trial, the trial court, with a different judge presiding, conducted an inquiry into the Fitzgeralds' choice to be represented by one lawyer. The questioning was as follows:

MS. SOKOLOVE [the prosecutor]: Your honor, Mr. Slattery represents co-defendants in this case. As a matter of precaution, I would ask the Court to make an inquiry of both defendants under oath and on the record with regard to their desire to have more counsel representing them. The Government's concern is that later on down the road this may become an issue, specifically as the case progresses. The defendants who, at this juncture, do not wish to testify

against one another, may choose to do so. That being, of course, a possibility, and as a matter of precaution, I would ask the Court to make an inquiry at some point as a preliminary matter.

THE COURT: Let's do it right now. Would the defendants both stand and raise their right hands. (Thereupon, both defendants were sworn by the Deputy Clerk.)

\* \* \* \* \* \*

THE COURT: As you have heard Ms. Sokolove, the Assistant U.S. Attorney, has asked that I put questions directly to you as to whether you want to proceed with both of you being represented by Mr. Slattery, that is both of you represented by the same attorney. She has suggested that at some point one of you may wish, may decide to testify against the other and there would then be a conflict of interest so far as Mr. Slattery is concerned.

Betty Fitzgerald, I will ask you first do you wish to proceed with both of you having Mr. Slattery as an attorney despite this possibility?

DEFENDANT BETTY FITZGERALD: Yes.

THE COURT: You're sure?

DEFENDANT BETTY FITZGERALD: (The defendant nodded her head.)

THE COURT: Renee, what is your position in this matter?

DEFENDANT RENEE FITZGERALD: I would rather have Mr. Slattery represent both of us.

THE COURT: Even though there may be a possibility, at least as outlined by Ms. Sokolove, that one of you will decide to take the stand against the other?

DEFENDANT RENEE FITZGERALD: Yes.

THE COURT: Ms. Sokolove, do you have any suggestion for further inquiry that—you're in possession of the facts and I'm not, that is, your alleged facts. Excuse me for not being more precise.

MS. SOKOLOVE: Your Honor, I would also wish to address or have the Court address, with regard to these particular defendants, as to whether there is anything in the case that they know of that may cause a conflict either at this point or with regard to questions that are put to Government witnesses, as well as the defense that they would be presenting themselves. I would say there are certain things they know of that the Government doesn't know.

THE COURT: Yes. Of course that would be the basis for the questions I put to you before.

We're about ready to call for a jury panel and get into trial. Once we're in that trial, it will be, there will be many matters inquired into and I want to be sure that we are not getting into a situation where there will be some conflict between you, you two sisters, such that I should have appointed or insisted on having separate counsel. Now, I, I'm reasonably sure that Mr. Slattery has reviewed this very carefully with you and he would, if he had sensed that there was a possible conflict, he probably would have brought it up himself. That would certainly be something that I would anticipate his doing. Has he discussed this possibility of conflict with you?

DEFENDANT BETTY FITZGERALD: Yes.

DEFENDANT RENEE FITZGERALD: Yes.

THE COURT: And are you satisfied that there will not be a conflict between you?

DEFENDANT RENEE FITZGERALD: Yes.

THE COURT: Let's go forward.

The court's Rule 44(b) inquiry in this case fell short of the requirements which we have outlined above in several respects. First and foremost, the Fitzgeralds were not adequately informed of their right to separate counsel, nor of their right to have counsel appointed if they could not afford it. The court did state, "I want to be sure that we are not getting into a situation where there will be some conflict between you ... such that I should have appointed or insisted on having separate counsel." This was not sufficient. By the terms of the Rule, the court must specifically "ad-

vise each defendant of his right to ... separate representation." *See Romero, supra,* 780 F.2d at 985; *Mers, supra,* 701 F.2d at 1326; *cf. Simpson v. Georgia,* 450 U.S. 972, 101 S.Ct. 1504, 67 L.Ed.2d 808 (1981) (waiver valid where trial judge several times told defendant that he had a right to replace counsel burdened by conflict of interest, and that court would appoint counsel if desired) (Brennan, J., dissenting from order granting certiorari, vacating and remanding).

■ Second, the record does not demonstrate that either Betty or Renee Fitzgerald understood the notion of "conflict of interest" as it might exist in this case. The court made no attempt to explain in concrete terms the possible risks of joint representation, other than briefly giving the example, suggested by the prosecutor, that one of the sisters may later decide to testify against the other. As we noted *supra* p. 1134, the trial court, aided by a brief inquiry of defense counsel as to the nature of the defenses,[5] should endeavor to explain the most common range of forms in which conflicts of interest may manifest themselves. *See, e.g., Bradshaw, supra,* 719 F.2d at 912; *see also Akinseye, supra,* 802 F.2d at 745 ("trial judge addressed the range of possible conflicts which might arise during trial").

■ The trial court appropriately asked defendants if their attorney had discussed the issue with them. However, we think that discussion with counsel is a supplement to, but not a substitute for, the court's own explanation of the possible sources of conflict. While an attorney representing multiple defendants has an ethical obligation to disclose potential conflicts of interest to his clients and to obtain their knowing consent,[6] we must recognize that financial considerations might dissuade some lawyers, especially in close cases, from resolving doubts concerning possible conflicts in favor of full disclosure to their clients, when such could result in loss of one or more clients. Nor is it sufficient to rely on counsel's representation that he has discussed the issue with his clients and obtained their consent to proceed;[7] counsel who had not done so or had done so only superficially would be disinclined to admit as much, since he would thereby be admitting to having violated a disciplinary rule. *See supra* note 6. For these reasons, we think it unwise to entrust the job mandated by Rule 44(b), of explaining the possible sources of conflict, to defense counsel. *See United States v. Iorizzo,* 786 F.2d 52, 59 (2d Cir.1986) (inquiry "conducted not by the court, but by the very attorney whose capacity to act in the defendant's interests was under challenge.").[8]

---

5. Such an inquiry was made here on the first trial date, when appellants' counsel briefly described the nature of the defenses. *See supra* p. 1135. The trial court apparently misunderstood that *both* defendants would claim that they did not live at the W Street apartment. Counsel assured the court that he foresaw no conflicts between the defenses, and the matter was not pursued further. The judge conducting this inquiry was not the same as the judge who conducted the later inquiry on the first day of trial, and who presided at trial.

6. *See* American Bar Association Code of Professional Responsibility DR 5–105. "If a lawyer is requested to undertake or to continue representation of multiple clients having potentially differing interests, he must weigh carefully the possibility that his judgment may be impaired or his loyalty divided if he accepts or continues the employment. He should resolve all doubts against the propriety of the representation." *Id.* EC 5–15.

7. At the earlier inquiry conducted in this case, the court asked defense counsel if such a discussion had occurred. *See supra* p. 1135.

8. *Cuyler v. Sullivan, supra,* 446 U.S. 335, 100 S.Ct. 1708 cited by the government, is not to the contrary. That case, decided before Fed.R. Crim.P. 44(c) went into effect in December of 1980, held that unless a state trial court knows or reasonably should know that a particular conflict of interest exists, it is not constitutionally required to initiate an inquiry into the matter. *Id.* at 347, 100 S.Ct. at 1717. In reaching this conclusion, the court stated:

> Defense counsel have an ethical obligation to avoid conflicting representations and to advise the court promptly when a conflict of interest arises during the course of trial. Absent special circumstances, therefore, trial courts *may* assume either that multiple representation entails no conflict or that the lawyer and his clients knowingly accept such risk of conflict as may exist.

*Id.* at 346–47 100 S.Ct. at 1717 (footnotes omitted) (emphasis supplied). *See also Burger v.*

**1138**

The inquiry conducted by the trial court in this case suffered from other defects as well. The questions asked called only for a "yes" or "no" answer. *See Iorizzo, supra,* 786 F.2d at 59. Moreover, although the court did elicit a reply from Betty Fitzgerald when it asked her if she was satisfied there would be no conflict, it failed to elicit a response from Renee; "[i]t is, of course, vital that the waiver be established by 'clear, unequivocal, and unambiguous language'." *Garcia, supra,* 517 F.2d at 278 (citation omitted); *see also Douglas, supra,* 488 A.2d at 138–39; Advisory Committee Note, *supra,* 77 F.R.D. at 601. We note also that the court failed to warn appellants that a waiver would preclude an argument on appeal that their defense was compromised by the conflict. *See Douglas, supra,* 488 A.2d at 138. In light of the inadequacies in the Rule 44 inquiry conducted in this case, we hold that the Fitzgeralds' waiver of their Sixth Amendment right to conflict-free assistance of counsel was not "knowing [and] intelligent." *Brady, supra,* 397 U.S. at 748, 90 S.Ct. at 1469.

### IV

Non-compliance with Rule 44(b) does not, by itself, mandate reversal, however. The federal courts of appeal have uniformly held that appellants must also demonstrate the existence of an actual conflict of interest.[9] *See, e.g., Romero, supra,* 780 F.2d at 986; *Mers, supra,* 701 F.2d at 1326; *Benavidez, supra* note 9, 664 F.2d at 1259; *see also* Advisory Committee Note, *supra,* 77 F.R.D. at 603 ("The failure in a particular case to conduct a rule 44(c) inquiry would not, standing alone, necessitate the reversal of a conviction of a jointly represented defendant."). "[A] defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief." *Cuyler, supra,* 446 U.S. at 349–50, 100 S.Ct. at 1719; *Mers, supra,* 701 F.2d at 1327. Actual conflict will not be found, however, unless "appellants can point to 'specific instances in the record to suggest an actual conflict or impairment of their interests.' " *Mers, supra,* 701 F.2d at 1328, citing *United States v. Fox,* 613 F.2d 99, 102 (5th Cir.1980). For example, "if the record shows that a plausible defense (one that might have influenced twelve reasonable jurors) was foreclosed because it might have prejudiced the other defendants represented by the same ... counsel, the conviction must be overturned.... An alleged conflict of interest that obstructs the use of a particular strategy or defense is not significant unless the defense is plausible." *Foxworth v. Wainwright,* 516 F.2d 1072, 1079–80 (5th Cir. 1975).

The Fitzgeralds contend that the conflict of interest which beset their attorney resulted primarily from the differing amounts of evidence against them with respect to certain counts of the indictment. For example, with regard to the narcotics

---

*Kemp,* — U.S. —, 107 S.Ct. 3114, 3120, 97 L.Ed.2d 638 (1987).

The Court did not, of course, intend to *require* state courts to rely upon an attorney's ethical obligations, any more than it intended to *forbid* state courts from initiating inquiries. The Court in *Cuyler* was concerned with whether a state court was constitutionally *required* to initiate an inquiry, not with how such inquiries *may* be conducted if a court chose, or was required by rule, to initiate them. In the latter case, at least in jurisdictions where courts are now required by rule to personally advise defendants on the subject, there is less reason to have to rely on assumptions as to the attorney's ethical behavior. We also observe that an attorney may perhaps be better counted on to advise the court of a conflict on his own initiative, than to admit, when asked by the court at a Rule 44 inquiry, to not having done so when he should have. *See* text *supra.*

9. Those courts have reasoned that "neither the inquiry nor the advice is itself the goal of the rule; the goal is preventing conflicts. If there is no actual conflict, then the rule's purpose will not be served by reversal of a conviction." *Mers, supra,* 701 F.2d at 1326, citing *United States v. Benavidez,* 664 F.2d 1255, 1258 (5th Cir.), *cert. denied,* 457 U.S. 1135, 102 S.Ct. 2963, 73 L.Ed.2d 1352 (1982).

The requirement is in keeping with the Supreme Court's holding that "[i]n order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler, supra,* 446 U.S. at 348, 100 S.Ct. at 1718.

count, the government's evidence of constructive possession was stronger against Betty Fitzgerald, who concededly lived in the W Street apartment, and who was found standing within three feet of the heroin discovered behind the couch, than it was against Renee Fitzgerald, who claimed to be only a frequent visitor at the W Street apartment, who had not been there in several days, and who did not arrive there until after the search was in progress. With respect to the firearm and ammunition counts, on the other hand, the evidence may have favored Betty Fitzgerald, in that five handguns, some of them loaded, were found in Renee Fitzgerald's bedroom (which still contained her clothes and personal effects and which she admitted to using even after her move), while only one pistol was found in Betty Fitzgerald's bedroom. They argue that their joint representation by a single lawyer prevented each of them from pursuing the defense strategy of emphasizing the greater amount of evidence against the other.

 "[A] strategy of shifting blame to one's codefendants is a legitimate and often effective defense strategy...." *Mers, supra,* 701 F.2d at 1330. Had Renee Fitzgerald been represented by separate counsel, her attorney could have exploited the evidence that she did not live in the apartment, had not visited there for several days, had not been there the previous night when her friend Abraham Aston (who Betty Fitzgerald intimated may have brought the heroin) had come, and had not been

there the day of the search. As it was, to the extent counsel did try to establish that Renee Fitzgerald was not involved in bringing in the contraband and keeping it in the house, he established that Betty Fitzgerald, his other client, was. *See Foxworth, supra,* 516 F.2d at 1078 (if joint counsel tried to show that one codefendant was not involved in fatal beating, as medical evidence indicated, he may have sent other co-defendant to the electric chair); *Campbell, supra,* 122 U.S.App.D.C. at 145, 352 F.2d at 361 (defendant against whom evidence was substantially weaker clearly prejudiced by joint counsel's inability to try to disassociate him from co-defendant); *Romero, supra,* 780 F.2d at 986 (low level employee of "front" organization for drug distribution operation precluded from shifting blame to manager represented by same counsel).[10] Similarly, counsel could not, for the benefit of Betty Fitzgerald's defense, exploit the fact that five guns were found in the bedroom previously inhabited and still used by Renee Fitzgerald, without harming his other client.

We do not know what witnesses, if any, counsel forewent calling at trial in aid of one co-defendant because the other would thereby be harmed, nor to what extent he was inhibited from successfully cross-examining the witnesses who did testify[11]—"[j]oint representation of conflicting interests is suspect because of what it tends to *prevent* the attorney from doing." *Holloway, supra,* 435 U.S. at 489–90, 98 S.Ct. at 1181 (emphasis supplied).[12] We do

---

**10.** Counsel's predicament is apparent from an examination of both his argument in favor of a motion for judgment of acquittal at the close of the government's case, and his closing argument. On both occasions, though never insinuating that Betty Fitzgerald was the primary culprit, he gave a lengthy argument emphasizing Renee Fitzgerald's lack of connection with the premises, followed by a few short sentences about the lack of direct evidence against her sister Betty. From the standpoint of Renee Fitzgerald, he was not at liberty to go far enough in actively highlighting Betty Fitzgerald's greater connection with the apartment. From the standpoint of Betty Fitzgerald, the extent to which he *did* go in dissassociating Renee Fitzgerald from the apartment could not help but put the relative strength of the evidence against Betty Fitzgerald in bold relief.

**11.** We do know that there was some confusion, for example, as to the location in the apartment in which $1018 in cash was found. One police officer testified that $983 was found in Betty Fitzgerald's bedroom and only $35 in Renee Fitzgerald's, while another seemed to indicate that the greater amount was found in Renee Fitzgerald's bedroom. *See supra* note 2. Defense counsel did not attempt to clarify this issue during cross-examination of the witnesses.

**12.** In this respect, claims of representation burdened by conflict of interest are similar to claims of ineffective assistance of counsel. On direct appeal, we are bound in both instances by the confines of the record before us, which may not adequately reflect what trial counsel *refrained* from doing. Therefore, we suggest, as we have when presented on direct appeal with

know that counsel was foreclosed from using a blame-shifting defense which would have been extremely feasible and useful in Renee Fitzgerald's case, and though less promising in Betty Fitzgerald's case, was realistically available and was perhaps the best strategy open to her in an otherwise weak defense.

The government asserts that the Fitzgerald sisters may have benefited from their common defense. It argues that "appellants fairly could have concluded that the benefits to be derived from joint representation and a 'united front' in which each denied knowledge of the contraband would exceed the benefits from a trial in which each was separately represented and asserted incompatible, recriminating defenses." We recognize that "[j]oint representation is a means of insuring against reciprocal recrimination. A common defense often gives strength against a common attack." *Glasser v. United States*, 315 U.S. 60, 92, 62 S.Ct. 457, 475, 86 L.Ed. 680 (1942) (Frankfurter, J., dissenting); *see also Holloway, supra,* 435 U.S. at 482–83, 98 S.Ct. at 1177–78. However, the government neglects the fact that the Fitzgerald's common defense strategy was not freely chosen. The conflict in this case "occurred not in presenting the defense chosen by ... counsel, but in selecting defenses and strategies in the first place." *Foxworth, supra,* 516 F.2d at 1079 (footnote omitted). As we have held *ante,* the Fitzgeralds' choice to be represented by a single lawyer was made without their being apprised of their potentially conflicting interests; their lawyer, in turn, could only choose a common defense in order to avoid conflict. "Under these circumstances, counsel's choice of the

'united we stand, divided we fall' defense was not a free choice of strategy," *id.,* and the Fitzgeralds' "choice" of such a strategy was even less voluntary.

We do not find *United States v. Benavidez, supra* note 9, upon which the government relies, persuasive precedent here. In that case, Benavidez, Tavarez, and a third codefendant were convicted of, among other narcotics offenses, conspiring to possess heroin with intent to distribute. Benavidez and Tavarez were represented at trial by the same lawyer. Each claimed on appeal that the dual representation precluded him from shifting the blame to the other. Benavidez argued that the case against Tavarez was stronger because the testimony of an informant placed Benavidez at fewer meetings of the co-conspirators than Tavarez. The court found that "[t]he additional proof of Tavarez' guilt in no way tends to prove Benavidez' innocence." 664 F.2d at 1261. As to Tavarez, the court remarked that he "does not point to any specific argument that counsel was precluded from making ... and in reviewing the record we have discerned none." *Id.* at 1262. Appellants' claims were rejected. In the case before us, both of the Fitzgerald sisters, unlike Tavarez, have pointed to specific arguments which they were precluded from making. Also unlike the situation in *Benavidez,* evidence or arguments presented in this case to exculpate one co-defendant would tend to inculpate the other—the contraband was obviously in the apartment, under circumstances making it unlikely that persons occupying the apartment would not know about it, and the two sisters were the only persons who plausibly could have had dominion and control over

claims of ineffective assistance, that "[i]f the appellant is able to furnish better evidentiary support for the present contentions based on material not provided in the record on appeal, or to frame and document contentions of ineffectiveness which we have not considered here, he is entitled to seek collateral relief in the Superior Court" under D.C.Code § 23–110 (1981), or under a timely motion for new trial under Super. Ct.Crim.R. 33. *Proctor v. United States,* 381 A.2d 249, 252 & n. 4 (D.C.1977); *see also Godfrey v. United States,* 454 A.2d 293, 302 (D.C.1982); *Angarano v. United States,* 329 A.2d 453, 457–58 (D.C.1974).

Upon a § 23–110 or Rule 33 motion, the Superior Court may order an evidentiary hearing to supplement the record. If the trial court indicates that it is willing to grant relief, this court, upon motion, will remand to the trial court. If the motion in Superior Court is denied, the appeal therefrom can be consolidated with the direct appeal, and the record of the hearing will become part of the record on appeal. *Smith v. Pollin,* 90 U.S.App.D.C. 178, 179, 194 F.2d 349, 350 (1952); *Doepel v. United States,* 434 A.2d 449, 451–52 (D.C.1981); *Angarano, supra,* 329 A.2d at 473 (Gallagher, J., dissenting).

it. In this sense, we find the facts of this case far more similar to *Foxworth, supra,* where, given the nature of the evidence, joint counsel could not attempt to exculpate one co-defendant without inculpating another. Unlike the defendants in *Benavidez,* the Fitzgeralds have shown that the blame-shifting strategy was "an option realistically available to trial counsel." *Mers, supra,* 701 F.2d at 1331.

Because the trial court failed to follow the requirements of Super.Ct.Crim.R. 44(b), and because an actual conflict of interest inhered in the joint representation in this case, the convictions of Betty and Renee Fitzgerald must be reversed.

*Reversed and remanded for a new trial.*