Dennis JACKSON, Appellant,

v.

UNITED STATES, Appellee.

Floyd R. BUSH, Appellant,

v.

UNITED STATES, Appellee.

Mitchell Q. OWENS, Appellant,

v.

UNITED STATES, Appellee.

Nos. 85–CF–1331, 85–CF–1337, 86–CF–1339.

District of Columbia Court of Appeals.

Argued Jan. 10, 1991.

Decided March 30, 1993.

---

Richard S. Stolker, Rockville, MD, for appellant Dennis Jackson.

Mona Asiner, Alexandria, VA, for appellant Floyd R. Bush.

Thomas Reed Kennedy, Washington, DC, was on the brief for appellant Mitchell Q. Owens.

Thomas C. Black, Asst. U.S. Atty., Washington, DC, with whom Jay B. Stephens, U.S. Atty. and Michael W. Farrell, Asst. U.S. Atty., at the time the brief was filed, and Elizabeth Trosman, Asst. U.S. Attys., Washington, DC, were on the brief, for appellee.

Before ROGERS, Chief Judge, SCHWELB and WAGNER, Associate Judges.

WAGNER, Associate Judge:

These consolidated appeals involve three co-defendants who were convicted following a joint trial for various offenses arising out of the armed robberies of three different liquor stores in the District within a one week period. During the last robbery, one of the robbers shot and killed a store manager, Lester Tuchman. The crimes occurred at: (1) Northeast Liquor Store on January 23, 1984; (2) Sol's Liquor Store on January 27, 1984; and (3) Kovak's Liquor Store on January 30, 1984. Appellant Mitchell Owens was the only defendant at trial indicted for offenses arising out of all three incidents.[1] Appellant Owens was

---

1. Christopher Sampson, a witness for the government at trial, had been charged with all counts arising out of the three robberies. However, prior to trial he entered pleas of guilty to

convicted of two counts of robbery while armed of Leroy Davis and Rod Coller which occurred at Northeast Liquor Store; three counts of robbery while armed of Allen Porter, Jochim Berger and James Proctor which occurred at Sol's Liquor Store; and attempted robbery while armed of Lester Tuchman, two counts of robbery while armed of William Morrison and Adrienne Brox, and one count of first-degree felony murder while armed of Lester Tuchman, all arising out of the crimes at Kovak's.[2] Appellant Floyd R. Bush was convicted of the same offenses as Owens related to the robberies of Northeast Liquor Store and Kovak's Liquor Store. Finally, Dennis Jackson was convicted of the charges stemming from the robberies of Sol's Liquor Store and Kovak's Liquor Store.[3]

Appellants raise numerous claims of error on appeal. Common to all appellants' arguments is that the trial court erred in denying their motions to sever counts and/or defendants. Appellant Jackson also contends that the trial court erred in denying his motion to suppress identification evidence. Appellant Bush also argues that reversal is required because the trial court erred in (1) admitting other crimes evidence; (2) failing to make an inquiry when it became apparent that a conflict of interest existed between his attorney and Owens' attorney; and (3) allowing the prosecutor to make improper arguments which resulted in an unfair trial. Appellant Owens contends that the trial court erred in failing to rule *sua sponte* that Owens' common-law wife had a spousal privilege which precluded her testimony and in quashing a subpoena for, or in failing to inspect *in camera*, psychological records of a key government witness. Finding no reversible error, we affirm.

## I. Facts

During January 1984, Christopher Sampson and his friend of seven years, appellant Owens, frequently visited the apartment of Barbara Singletary at 1254 C Street, Southeast, Washington, D.C. Singletary's home was a known "shooting gallery," *i.e.*, a place which people paid to enter to inject heroin. Singletary's boyfriend, John Williams,[4] had introduced Sampson and Owens to appellants Bush and Jackson about five months earlier. Ms. Singletary testified that she had known appellant Jackson since they were teenagers and that appellant Owens had introduced her to Sampson and Bush.

Ms. Singletary testified that the four men were often together in her apartment, *i.e.*, "two—three times a week." Sampson referred to the house as the group's headquarters. According to Ms. Singletary's testimony, some time after January 11, 1984, she overheard a discussion between Owens and Jackson about a liquor store. However, she could not place appellant Bush in the discussion, and she only assumed that Sampson was present because he was there with them most of the time. Ms. Singletary recounted the discussion this way:

> They didn't have enough money. They needed more money. They had to hit some place easy. Get at least a liquor store that was easy for them so they could have some money, more money.

four counts of armed robbery and one count of second degree murder while armed in exchange for the government's agreement to dismiss the remaining charges against him.

**2.** The indictment charged, and appellants were convicted of, offenses under the following sections of the D.C.Code: armed robbery, D.C.Code §§ 22–2901, –3202 (1981); attempted robbery while armed, D.C.Code §§ 22–2902, –3202 (1981); and first-degree felony murder, D.C.Code § 22–2401 (1981).

**3.** The trial court determined that appellants' convictions for attempted armed robbery of Mr.

Tuchman, armed robbery of William Morrison and armed robbery of Adrienne Brox, merged with the charge for felony murder of Mr. Tuchman. Therefore, the court vacated those convictions.

**4.** John Williams was a key government witness. Although not connected with these crimes, Williams' arrest and subsequent plea negotiations for charges of burglary-I while armed and armed robbery on February 4, 1984, led to his disclosure of information about the liquor store robberies and appellants' arrests.

John Williams testified that in early 1984 he discussed with Owens, Bush, and Sampson the possibility of robbing Kovak's Liquor store, which Owens, who knew the "spots," said was "sweet." Owens also said that Kovak's had a lot of machines and cash registers, but that the group did not have enough weapons to rob a store of that size. Sampson testified that at some point he and Owens had agreed that Kovak's could be taken, but that they needed more than three people and three pistols. The three robberies occurred after these discussions.

### A. The Robbery of Northeast Liquor Store

On January 23, 1984, Sampson and Owens discussed robbing Northeast Liquor Store, selecting that store because of its secluded location. The two men met at Singletary's apartment and asked Floyd Bush to assist them. Bush agreed. Sampson had the only weapon, a .38 caliber pistol. Owens drove the three men to the store in his green Datsun. Owens parked in a nearby alley and left Sampson and Bush in the car while he went to case the store. About two minutes later Owens returned to the car and gave Bush and Owens the go-ahead.

Between 5:00 and 5:30 p.m. Bush and Sampson entered the store. Sampson pulled out his gun, jumped on the counter, yelled "stick up" and ordered everyone to lie on the floor. At the time, two employees, Leroy Davis and Rod Coller, and at least two customers were in the store. Although neither employee saw who gave the order, they both complied. One of the customers, Arthur Williams, apparently stunned, remained standing. Sampson went to Coller's location, opened the cash register and removed the money. Sampson also took an old pistol with a long barrel (.38 long) from a nearby shelf.

In the meantime, Bush picked up one of the clerks (Leroy Davis) by the belt and ordered him to open the other cash register. Davis complied. Bush pushed Davis back to the floor and removed money from the register. Sampson jumped over the counter just before leaving and fell. Bush and Sampson then ran to the alley where Owens was waiting in the car. As Owens drove away, Sampson and Bush lay down inside the car to avoid being seen. Sampson, Bush, and Owens returned to Singletary's apartment where they divided the money. They gave Ms. Singletary $20.00.

Sampson and Owens spent the night at a hotel. Subsequently Owens informed John Williams, Singletary's boyfriend, that he had participated in the robbery of the liquor store. Williams also testified that Owens showed him the gun they took from the store, which Williams described as a big "mounty gun" with a clip on the butt.

### B. The Robbery of Sol's Liquor Store

Williams testified that after Owens showed him the mounty gun, he was present when Sampson, Bush, and Owens discussed whether they had enough guns to rob Kovak's. Owens said he thought they did not. Shortly thereafter Sampson and Owens convinced Dennis Jackson to help rob another liquor store. On January 27th the three men rode around in Owens' Datsun looking for a store to rob, and they settled on Sol's Liquor Store. Again Owens went into the store alone, reported back to his cohorts that conditions were good, and drove around the block before parking nearby. It was about 5:20 p.m. when Sampson, armed with a .38, and Jackson, armed with the .38 long taken in the Northeast Liquor Store robbery, entered Sol's. The owner, Jochim Berger, and two employees, Alan Porter and James Proctor, were behind one counter, while Margaret Peach, another employee, was operating a lottery machine at another. Charles Mayo, another employee, was stocking beer at another counter.

Alan Porter first noticed the two robbers when one said, "Hold it right there." Jackson, who was holding a gun, was near the counter where the men were working. Sampson jumped over the counter and ordered Mr. Porter to open the cash register. Sampson took money out of the cash drawer and asked Jackson whether he should take the change. He filled a bag with more money after Jackson responded affir-

matively. Sampson took wallets from Berger and Porter and cash from James Proctor. Jackson continued to stand guard, threatening the store's employees. Sampson vaulted over the counter, and he and Jackson ran to the alley where Owens was waiting in the get-away car. Owens drove the group to Jackson's house where they split the money. Sampson spent the night in an Econo Lodge with Owens and his girlfriend, Barbara Moore.

### C. The Robbery of Kovak's Liquor Store

After the Sol's Liquor Store robbery, Owens and Sampson decided that two guns were enough to rob Kovak's. On January 30, 1984, Owens and Sampson met Jackson and Bush at Singletary's apartment. Owens assigned responsibilities to each of them. Jackson was to "hold the store" *i.e.*, make sure no one entered or left during the robbery; Bush was to take the money from one cash register and the lottery machine on the right; Sampson was to take the register on the left side of the store; and Owens was to wait outside and act as the lookout. Owens drove to Kovak's in his green Datsun which he parked in an alley nearby. As the trio walked from the car to the store, Sampson handed Jackson the .38 long which had been taken in the Northeast Liquor Store robbery. When Jackson, Bush and Sampson entered the store at about 7:30 p.m., the manager, Lester Tuchman, and a clerk, William Morrison, were working behind the main counter on the left side of the store, and Adrienne Brox was selling lottery tickets at the counter on the other side. One customer, Errick Murdock, was waiting to buy a lottery ticket from Brox, while another, Reginald Reid, was in the rear of the store.

Consistent with their plans, Bush went to the lottery machine, Sampson went behind the counter where Tuchman and Morrison were working, and Jackson, armed with the .38, stood near the front counter, announced the robbery, and commanded everybody to remain where they were.

Sampson took two wallets from Morrison's pocket, forced him toward the cash register, and ordered him to open it. The manager, Tuchman, kept moving in spite of Jackson's command that he stop, and Jackson shot Tuchman in the chest from a distance of about four feet. Sampson started to leave the store, but he returned to get the money from the cash register. Bush, who had ordered Ms. Brox to open the register near the lottery machine, started to leave, but Jackson told him to make sure he had all of the money. Bush returned to Brox's station and took more money from a cigar box inside a drawer. Before leaving, Jackson commanded everyone to remain where they were, threw a display case of watches to the floor, and kicked it. Someone yelled, "Mike, c'mon let's go." Bush, Sampson, and Jackson ran outside where Owens was waiting in the Datsun. Again, the three passengers lay down to avoid being seen as Owens drove away. Jackson told Sampson that he shot the clerk because he thought the man was reaching for something. Sampson stayed at the Econo Lodge after this robbery.

John Williams testified that the day after the robbery, Bush admitted to him that he was involved in the robbery with three others; that an employee had been shot with the "mounty" gun because he appeared to be reaching for a weapon; that the shooter knocked over the watch display case after the shooting; and that they used a green Datsun as the get-away car.

### II. Joinder Issues

Appellants were indicted jointly and tried on all counts arising out of the three separate criminal events described above. Each appellant argues that the trial court erred in failing to sever some of the counts for trial. Therefore, we review first some of the principles which control disposition of these issues generally.

 In cases involving more than one defendant, Super.Ct.Crim.R. 8(b) controls whether joinder is proper.[5] *Settles v. Unit-*

---

5. Super.Ct.Crim.R. 8(b) provides:
 *Joinder of defendants.* Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions

*ed States*, 522 A.2d 348, 352 (D.C.1987); *Ray v. United States*, 472 A.2d 854, 857 (D.C.1984). The rule controls whether the issue raised on appeal challenges joinder of defendants or offenses. *Ray*, 472 A.2d at 857. Under this rule, it is not necessary that all defendants be charged in each count. *Id.* Although properly joined under Rule 8(b), severance may be warranted "if joinder prejudices any party." *Id.* at 856; *Russell v. United States*, 586 A.2d 695, 698 (D.C.1991). The grant or denial of severance of offenses properly joined is within the sound discretion of the trial court, and will result in reversal only upon a showing of abuse of discretion. *Russell*, 586 A.2d at 698. Where individuals are charged jointly with committing crimes, there is a strong presumption that the offenses should be tried together. *Id.*

■ In a case involving multiple defendants, Rule 8(b) allows joinder only if the offenses "are based on the same act or transaction or series of acts or transactions." *Ray, supra*, 472 A.2d at 857. For purposes of joinder, multiple offenses are deemed to constitute a series of acts or transactions only when they meet the following criteria: "(1) where the offenses are committed as a means to a specific common end, or where they are directed toward some shared goal; (2) where one offense logically leads to another; and (3) where the offenses are part of a common scheme or plan, involving the same place, a short period of time, and a similar modus operandi, so that there is necessarily a substantial overlap in proof of the various crimes and 'it would be difficult to separate proof of one from the other.'" *Davis v. United States*, 367 A.2d 1254, 1262 (D.C.1976), *cert. denied*, 434 U.S. 847, 98 S.Ct. 154, 54 L.Ed.2d 114 (1977) (footnotes omitted); accord *Byrd v. United States*, 551 A.2d 96, 99 (D.C.1988), *cert. denied*, 493 U.S. 968, 110 S.Ct. 415, 107 L.Ed.2d 380 (1989); *Wright v. United States*, 510 A.2d 223, 224 (D.C.1986). These categories constitute an exclusive list of factors for determining whether offenses are properly joined under

Rule 8(b) in all multi-defendant cases. *Settles, supra*, 522 A.2d at 352.

### A. *Floyd Bush's Joinder Challenge*

Appellant Bush argues on appeal that the trial court erred in denying his motion for severance because the counts related to the offenses at Northeast Liquor Store and Kovak's Liquor Store were joined improperly under Super.Ct.Crim.R. 8(b). Assuming proper joinder, he contends that the offenses should have been severed under Super.Ct.Crim.R. 14 because of undue prejudice. Specifically, appellant Bush asserts that the two separate criminal incidents did not fall within any of the exclusive categories required for joinder under Rule 8(b) as outlined in *Davis, supra*, 367 A.2d at 1262. The government argues the contrary, contending that its evidence established that the offenses were a part of a common scheme or plan and were committed to achieve a common goal within the meaning of the rule. *See Settles, supra*, 522 A.2d at 352.

■ We consider first the government's theory that the crimes meet the criteria for a common goal. For offenses to fall within this category, the sets of offenses must be directed toward a specific goal or must depend for their success upon each other. *Id.* at 353; *Davis, supra*, 367 A.2d at 1263; *Ray, supra*, 472 A.2d at 858. In support of its position, the government relies on the fact that another appellant, Owens, determined to commit the Kovak's robbery prior to the first robbery at Northeast Liquor Store for the purpose of obtaining more guns and cash to enable the participants to rob the larger store, Kovak's. We view these facts as too general to support the common, unitary goal requirement. Each of the separate incidents was an isolated event, and no one of them actually depended upon the other for its success. In each instance the object was to obtain money, with only an additional interest articulated by one of the instigators that the group should also steal guns to facilitate other robberies. In the context

---

constituting an offense or offenses. Such defendants may be charged in 1 or more counts together or separately and all of the defendants need not be charged in each count.

of this case, the robbery of each liquor store was an end in itself. It was not shown that the sole purpose for the first two robberies was to further the goal of robbing the third store. Therefore, we consider the goal advanced by the government to be simply too broad and too unspecific to meet the requirement for a specific, unitary goal toward which the criminal acts were directed. *See Ray,* 472 A.2d at 858. The goal of obtaining property from others, here money and guns, was too general for joinder of offenses under Rule 8(b). *See id.* at 858.

■ The government also argues that the offenses are joined properly under Rule 8(b) because they formed a part of common scheme or plan. Specifically, the government contends that appellant Owens and Christopher Sampson were close associates who planned the robberies in advance and secured the help of the others to carry out their plans. Additionally, the government cites similarities in the modus operandi for each of the crimes, including: use of the green Datsun; Owens' preliminary survey of the targeted store and his driving of the get-away car; assignments by Owens to the others; and the manner in which one person "held the floor" while other participants looted the cash registers and lottery machines.

The government's argument is similar in many respects to the arguments rejected by this court in *Davis, supra.* In *Davis,* the appellants were charged in a forty-four count indictment with multiple armed offenses, including kidnapping, robbery and rape, arising out of eight incidents, involving eight women in the District of Columbia. One of the appellants, Warren, challenged joinder of the counts which charged Davis either alone or with others, for assaults on three of the complainants in the same indictment with those counts charging Warren and Davis jointly with criminal assaults on four of the victims. We held that the counts were misjoined. *Davis,* 367 A.2d at 1263. In doing so, we rejected the government's argument that the similarity

of the modus operandi for each criminal incident fulfilled the requirements of Rule 8(b), *i.e.,* that both defendants be charged with having participated in a "series of acts or transactions." *Id.* at 1261. In *Davis,* the government had argued in opposition to Warren's motion for severance the similarity in the modus operandi with respect to the use of the same green Vega; the occurrence of all offenses within a seven month period; and the fact that the appellants knew each other and were identified by some of the complaining witnesses. In *Davis,* we acknowledged the principle that:

> The series of acts envisioned by the drafters of Rule 8(b) is one in which the individual offenses are connected or interrelated in such a manner that proof of charges against one defendant would necessarily have to be introduced in proving the jointly-charged offenses, or that the government otherwise will benefit without further prejudicing the defendant.

*Id.* at 1261.

In rejecting the government's argument in *Davis* that joinder was proper, we observed particularly that the offenses occurred at a different time of day and place, with different witnesses who had different accounts of each incident. Similarly, in this case, the incidents occurred at different stores on different dates. The three incidents involved different victims. In this case, as in *Davis,* the government made no allegation in the indictment that the offenses were part of a conspiracy. While it is not necessary that defendants be charged with conspiracy for joinder under Rule 8(b), it must be shown that "each act or transaction was part of a series of acts or transactions and that each defendant participated in the series of transactions." *United States v. Scott,* 413 F.2d 932, 935 (7th Cir.1969), *cert. denied,* 396 U.S. 1006, 90 S.Ct. 560, 24 L.Ed.2d 498 (1970). We are not persuaded that the three separate incidents involved here meet that test.[6] In this case there was not such

---

**6.** In *Scott, supra,* on which the government relies, a sufficient connection was found to meet

the requirements of Rule 8(b). The case involved the convictions of three postal employees

a close connection between the separate robberies. *Cf. Id.*

■ Where offenses are considered to constitute a series of acts or transactions because they are part of a common scheme or plan, it is also necessary that there be a substantial overlap in proof of the various crimes such that it would be difficult to separate proof of one from the other. *Settles, supra,* 522 A.2d at 352; *accord Byrd, supra,* 551 A.2d at 99; *Ray, supra,* 472 A.2d at 858. Appellant argues that the only overlap in proof between the two criminal incidents was that the gun taken in the first robbery of Northeast Liquor Store was allegedly used in the third robbery and murder at Kovak's Liquor Store. However, the government also relies upon the following evidence to demonstrate the requisite overlap: (1) the association among the perpetrators of each crime; (2) the distinctive antique pistol taken in the Northeast Liquor Store incident which was also used in the murder at Kovak's, an important identification factor; (3) the type of stores involved; (4) the timing of the crimes within one week of each other; (5) the use of the same green Datsun as the get-away car; and (6) the use of a similar modus operandi at the scene of each offense.

■ Two factors are critical in meeting the requirement that proof of the crimes overlap. The overlap must be "substantial" and "necessary." *Ray, supra,* 472 A.2d at 858. In *Ray,* we found the necessary overlap lacking where the perpetrators of a robbery were caught later committing a burglary while wearing coats taken in the earlier robbery. Pertinent to our disposition of the issue in *Ray* was that in the robbery case, the government had only to prove that the appellants were seen wearing the coats fifteen minutes after the robbery, while proof of the facts surrounding the burglary would not be necessary to proof of the robbery charge. Therefore, we determined that the overlap of proof

was not substantial and that joinder was improper. *Id.*

Unlike *Ray,* in this case there appears to have been a sufficient overlap of proof to warrant joinder of the offenses involved in Bush's primary challenge. The key element involved here was that a unique antique Webley pistol was stolen in the first robbery of Northeast Liquor Store and a similar unique weapon was used in the robbery and murder at Kovak's Liquor Store. The unusual weapon provided important identification testimony for both robberies. Additionally, the perpetrators' plans and association with each other as well as use of the green Datsun provided some evidence to connect appellant with each of the two crimes. However, in view of the government's failure to establish initially that the crimes constituted a part of a common scheme or plan, this overlap of proof is insufficient to constitute a series of acts or transactions permitting joinder under Rule 8(b). Nevertheless, similar factors are pertinent to our harmless error inquiry in connection with appellant Bush's challenge.

■ Misjoinder under Rule 8(b) is subject to a harmless error analysis. *United States v. Lane,* 474 U.S. 438, 449, 106 S.Ct. 725, 732, 88 L.Ed.2d 814 (1986); *Byrd, supra,* 551 A.2d at 99; *Settles, supra,* 522 A.2d at 354; *see also Wright, supra,* 510 A.2d at 225. "Misjoinder is harmless, however, only if it has 'no substantial and injurious effect or influence in determining the jury's verdict.'" *Settles,* 522 A.2d at 354 (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946), quoted in *Lane,* 474 U.S. at 449, 106 S.Ct. at 732). Misjoinder is generally considered harmless if all or substantially all of the evidence of one offense would be admissible in a separate trial of the other. *Ray, supra,* 472 A.2d at 859. The obvious reason for this is that there can be no danger of prejudice in trying cases jointly where the offenses are mutu-

for removing coin pouches from the mail at the Post Office on three separate dates, October 27, November 5, and November 8, 1965. In *Scott,* the court found a specific connection between the acts and that they were based on series of acts or transactions because of the existence of a common plan to rob the mails at the Main Post Office in Chicago. *Id.* at 935.

ally admissible and the jury will hear about both crimes. *Id.*

In determining whether evidence of each offense would be admissible in a separate trial of the other, we rely on *Drew v. United States,* 118 U.S.App.D.C. 11, 331 F.2d 85 (1964). The aspect of *Drew* pertinent to our review in this case is that evidence of other crimes is admissible when relevant to prove the identity of the person charged. *Id.* at 16, 331 F.2d at 90. To be admissible on the issue of identity in a separate trial, evidence of the circumstances surrounding the crimes must show that there is "a reasonable probability that the same person committed both crimes due to the concurrence of unusual and distinctive facts" relating to them. *Easton v. United States,* 533 A.2d 904, 907 (D.C. 1987). No single characteristic is required to meet this test. *Id.; Bridges v. United States,* 381 A.2d 1073, 1078 (D.C.1977), *cert. denied,* 439 U.S. 842, 99 S.Ct. 135, 58 L.Ed.2d 141 (1978). What is important is that the cumulation of circumstances converge to show that the two crimes were committed by the same person. *Easton,* 533 A.2d at 907.

The issue must be a legitimate, contested issue in the case. In spite of the identification of appellant by his former co-defendant, Sampson, appellant Bush's identity was a contested issue in the case. Appellant presented evidence from one witness that she saw two men in a red car pull into the alley at Kovak's prior to the robbery. Appellant Bush's evidence was directed at showing that others, not he, were the perpetrators. Thus, association of appellant with the earlier activity had actual bearing on the proof of an issue essential to the government's case. *See Bradley v.*

*United States,* 140 U.S.App.D.C. 7, 14, 433 F.2d 1113, 1120 (1989).

Moreover, a misjoinder error can be "harmless when the evidence of guilt presented by the government is overwhelming." *Byrd, supra,* 551 A.2d at 99 n. 8 (citing *United States v. Lane, supra,* 474 U.S. at 450 n. 13, 106 S.Ct. at 732–33 n. 13). Bush's implication in both robberies by his former co-defendant, Sampson, was corroborated by other witnesses, including an eyewitness who identified Bush as being at the Northeast Liquor Store robbery and another who identified him without equivocation in connection with the Kovak's Liquor Store robbery. Accordingly, we conclude that misjoinder of the offenses involved in the two separate incidents which appellant Bush challenges was harmless.[7]

### B. Dennis Jackson's Joinder Contentions

Appellant Jackson argues for the first time on appeal that the charges against him should have been severed from those of his co-defendants under Rule 14 because their defenses were conflicting and the quantum of evidence linking him to the crimes was far less than that against his co-defendants. He did not raise the claims of irreconcilable defenses and disparity of evidence in his pretrial motion for severance nor at trial. Therefore, the court generally will not consider them on appeal. *See Butler v. United States,* 614 A.2d 875, 882 n. 13 (D.C.1992); *Byrd v. United States,* 502 A.2d 451, 453 (D.C.1985). Here, we find no plain error related to these claims.

Appellant Jackson also contends that the offenses at Sol's Liquor Store (for which he was not charged) were improperly joined with the other crimes charged. Based on

---

7. Appellant Bush does not argue that his cases were improperly joined with the second offense at Sol's Liquor Store. Therefore, we do not address the issue. *See Davis, supra,* 367 A.2d at 1264. However, appellant argues that the robbery at Sol's should have been severed under Rule 14. Rule 14 applies only where initial joinder was proper. *Scott, supra,* 413 F.2d at 935; *United States v. Franks,* 511 F.2d 25, 30 (6th Cir.), *cert. denied,* 422 U.S. 1042, 1048, 95 S.Ct. 2654, 2656, 2667, 45 L.Ed.2d 693, 701 (1975). Even assuming that the charges were properly joined, Rule 14 authorizes a separate trial to avoid undue prejudice. The trial court's denial of severance is reversible only for an abuse of discretion. *Russell v. United States,* 586 A.2d 695, 698 (D.C.1991). It does not appear that appellant was prejudiced by the joinder of the Sol's Liquor Store robbery. The evidence as to each defendant was presented in such a way that it could be kept separate and distinct.

the analysis of Bush's challenge to initial joinder, we conclude that any error under Rule 8(b) was harmless.

### C. *Mitchell Q. Owens' Severance Contentions*

Appellant Owens, who was charged for offenses arising out of all three incidents, argues that he was denied a fair trial by joinder of his case with that of his two co-defendants because of an alleged disparity in the evidence. We find no merit to Owens' claim. The evidence established that he was a central figure in each of the crimes. Two former co-defendants identified Owens as a principal planner of the robberies and driver of the get-away car on each occasion. An independent witness, Dennis Applewhite, saw appellant Owens near Kovak's Liquor Store on the evening of the crimes there. Accordingly, we reject appellant's claim.

### III. Mitchell Q. Owens' Remaining Claims
### A.

Prior to trial, appellant Owens issued a subpoena seeking to obtain the medical and psychiatric records of a witness for the government, a former co-defendant, Christopher Sampson. The trial court (J. Scott) quashed the subpoena. Sampson testified that he had used phencyclidine (PCP) for several years on a regular basis, that less than two years before the offenses he had been hospitalized for psychiatric problems associated in part with PCP use, and that he hallucinated during that period. Appellant argues that he needed the records in order to test Sampson's competency to testify and to assist with his cross-examination.

■ Appellant does not challenge the applicability of D.C.Code § 6–2002 (1989) which restricts disclosure of mental health records to any person with certain exceptions not pertinent here. Disclosures by the court are permitted in cases where the court has ordered the mental health examination, *see* D.C.Code § 6–2031, but then only "to the extent necessary to initiate or seek civil commitment." D.C.Code § 6–

2032. Where a party places in issue his own mental or emotional condition, then such records may be disclosed. D.C.Code § 6–2033.

While a defendant in a criminal case may establish bias of a witness through the introduction of extrinsic evidence, the accused, like the state, must comply with established rules of procedure and evidence to assure fairness and reliability. *Gibson v. United States*, 536 A.2d 78, 82 (D.C. 1987). The individual's interest under D.C.Code § 6–2002 is not absolute, and may have to yield where the right of the defense to cross-examine a witness in a criminal case must be accorded protection. *United States v. Lindstrom*, 698 F.2d 1154, 1167 (11th Cir.1983).

■ Appellant proffered that he wished to cross-examine Sampson on matters related to an alleged remark he made to his psychologist that Owens was "a devil" in order to demonstrate bias. The court inquired of Owens' counsel about the basis for his belief regarding the statement, and the attorney represented that Sampson told Owens and his sister about the remark. The court concluded that there were other witnesses who could testify about their firsthand knowledge concerning the alleged remark and denied the motion. In spite of the availability of these witnesses at trial, Owens did not inquire into the matter either of Sampson or the witnesses who allegedly knew about the statement. Appellant did not challenge Sampson's competency to testify. Further, Sampson testified about his hospitalization for psychiatric problems, his use of PCP, and prior hallucinations. Although the combination of circumstances—Sampson's use of PCP, his past hallucinations, his psychiatric hospitalization and his alleged "devil" remark— may have justified an *in camera* inspection of the records by the judge, we find no reversible error. The jury heard a good deal of evidence about Sampson's infirmities, and even assuming, *arguendo*, that there was error, we are satisfied that it was harmless.

### B. *Owens' Claim of Violation of Spousal Privilege*

■ Appellant Owens claims that he was denied a fair trial because his common-law wife, Miss Sheryl Sampson, was compelled to testify against him before the grand jury and at trial without being apprised of her statutory spousal privilege. In civil or criminal proceedings, a husband or wife is competent to testify, but neither may be compelled to do so. D.C.Code § 14–306.[8] Miss Sampson testified on direct examination for the government and characterized herself as Owens' former common-law wife. She stated that she had a six and one half year relationship with Owens and that he was the father of her six and one half year old child. Miss Sampson acknowledged that her relationship with Owens had concluded. Other evidence showed that Owens married someone named Barbara Moore in June 1984.

■ Common-law marriages are covered by the marital privilege. *Bowler v. United States*, 480 A.2d 678, 685 (D.C. 1984). Moreover, confidential communications made during the marriage survive the dissolution of the marriage. *United States v. Lewis*, 140 U.S.App.D.C. 40, 43 n. 10, 433 F.2d 1146, 1149 n. 10 (1970). Therefore, Miss Sampson's status at the time of trial makes no difference with respect to the availability of the privilege for confidential communications.

Miss Sampson denied at trial that Owens had admitted his involvement in the Kovak's robbery, and the prosecutor impeached her with her grand jury testimony to the contrary given on January 18, 1985. An appropriate limiting instruction on the use of the prior testimony for impeachment purposes only was given by the trial court. The court repeated the instruction during its final charge to the jury. The court also instructed the jury, consistent with Miss Sampson's trial testimony, that Mr. Owens had not told her that he participated in the robbery and that they should accept that testimony as fact.

■ No one alerted the court or objected that Miss Sampson's testimony fell within the spousal privilege. Had the potential for privilege been clear, it would have been incumbent upon the court to address the witness and to inform her that she could not be compelled to testify. *See Bowler, supra,* 480 A.2d at 685. Here, the availability of the privilege was less than clear because of the uncertainty about Miss Sampson's status, and any claim to that effect went unnoticed because of the failure of Miss Sampson or appellant Owens to call the matter to the attention of the court.

Even assuming error in the failure of the trial court to inquire, we find that appellant suffered no prejudice in view of the limited use of Miss Sampson's testimony for impeachment purposes, the limiting instruction, as well as the further instruction given by the court that the jury should consider as fact that appellant never made the remark which the prosecutor sought to elicit.[9]

## IV. Floyd R. Bush's Remaining Claims

### A. *Conflict of Interest of Co-defendant's Counsel*

Appellant Bush argues that his conviction should be reversed because there was a conflict of interest created because he had been represented in a prior, unrelated case by the same trial counsel representing co-defendant Owens in this case. In the earlier case, John Williams, who was a witness for the government in this case, was also Bush's co-defendant.[10] Although Bush did not assert a conflict of interest in the trial court, he contends that the trial court should have known of the conflict

---

8. D.C.Code § 14–306 (1989) provides:
 (a) In civil and criminal proceedings, a husband or his wife is competent but not compellable to testify for or against the other.
 (b) In civil and criminal proceedings, a husband or his wife is not competent to testify as to any confidential communications made by one to the other during the marriage.

9. We find the claim of prosecutorial misconduct in "seeking" the testimony of this witness to be without merit.

10. Bush and Williams entered pleas of guilty in the prior case.

and inquired because during a discussion of the plea arrangement with Mr. Williams, the attorney for appellant Bush informed the court that Owens' attorney might be able to verify the plea arrangements because she had represented Bush in the other case.

 ██ The accused in a criminal case has the right to the effective assistance of counsel which necessitates that counsel have the ability and willingness to advocate effectively for his client. *Douglas v. United States*, 488 A.2d 121, 135 (D.C.1985). To ensure this right, it is essential that defense counsel have no conflict of interest which might divide his loyalty to the accused. *Id.* at 136; *Fitzgerald v. United States*, 530 A.2d 1129, 1133 (D.C.1987). Therefore, the court has an obligation to inquire when it becomes apparent that a particular conflict exists. *Cuyler v. Sullivan*, 446 U.S. 335, 347, 100 S.Ct. 1708, 1716, 64 L.Ed.2d 333 (1980); *Douglas*, 488 A.2d at 136. Where a defendant fails to object on the basis of such conflict, "a Sixth Amendment violation warranting reversal will be established if a convicted defendant demonstrates on appeal that 'an actual conflict of interest adversely affected his lawyer's performance.'" *Douglas*, 488 A.2d at 136 (footnote omitted) (quoting *Cuyler*, 446 U.S. at 348, 100 S.Ct. at 1718). Where a defendant fails to object at trial, but can demonstrate that the conflict of interest "'actually affected the adequacy of his representation,'" that defendant "need not go so far as to show that the conflict prejudiced the outcome of the case" in order to obtain reversal. *Douglas*, 488 A.2d at 136 n. 16 (quoting *Cuyler*, 446 U.S. at 349–50, 100 S.Ct. at 1718–19). Such conflicts occur most often when one attorney represents several defendants in a single case. *Fitzgerald*, 530 A.2d at 1133. The types of harm which might result in such a situation include the following:

an attorney may refrain from challenging the admission of evidence prejudicial to one client but favorable to another, or from emphasizing the culpability of one client in order to exculpate another, or from allowing one defendant to testify against another, or from presenting a defense that helps one client but harms another, or from entering a plea agreement for one client conditioned upon his testimony for the prosecution against another client.

*Id.* at 1133.

 Here appellant Bush does not allege that the attorney who represented him in this case was ineffective or had any conflict of interest. Rather, he contends that the representation of his co-defendant in this case by an attorney that he had in another case created a conflict which resulted in potential prejudice to him. The only actual claim of prejudice which appellant cites is that when one of the witnesses in the Kovak's robbery identified him from a photograph, his former attorney stated on the record that she had no objection when the government moved the admission of the photograph into evidence. We need not decide whether the rule in *Fitzgerald* and *Douglas* extends to the type of challenge made here. Even assuming that it does, the demonstration of an actual conflict affecting his lawyer's performance has not been shown. *See Douglas, supra*, 488 A.2d at 136.

### B. *Improper Prosecutorial Conduct*

Appellant Bush also argues that the prosecutor's improper closing argument denied him a fair trial. First, appellant Bush contends that the prosecutor improperly commented on his failure to testify. The alleged improper comment included the rhetorical remark, "Where's the defense?" Appellant also challenges the following additional statement made by the prosecutor:

When I say that they have given you no defense that is not quite true. It is true that [counsel] on behalf of Mr. Jackson did present a defense—this is the alibi defense he was referring to.

 Of course, the Fifth Amendment precludes the prosecutor from commenting on the silence of the accused. *Griffin v. California*, 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106 (1965); *Watts v. United States*, 449 A.2d 308, 312 (D.C. 1982). Error occurs when the prosecutor's

language "was manifestly intended or was of such a character that the jury would naturally and necessarily take it to be a comment on the failure to testify." *Watts,* 449 A.2d at 312; (quoting *Byrd v. U.S.,* 364 A.2d 1215, 1218 (D.C.1976)). However, appellant's Fifth Amendment right "does not preclude the prosecutor from emphasizing to the jury that the government's evidence [is] uncontradicted." *Boyd v. United States,* 473 A.2d 828, 833 (D.C.1984). In order for such comments to result in reversible error, it must be shown that no one other than the accused could have offered contradictory evidence. *Id.; Watts,* 449 A.2d at 313. The reason for this rule is that such comments would naturally lead the jury to focus on defendant's silence. *Boyd,* 473 A.2d at 833.

 To determine whether the challenged comment was improper, the comments must also be viewed in context, and consideration must be given to the availability of others sources of the information. Having examined in context the challenged argument, we find no reversible error. The remarks fall within permissible limits for proper argument in that they emphasize that no contradiction has been given to the government's case or that no reason has been given not to believe the witness who testified. *See id.* The remarks made here are similar to those made in the *Boyd* case where we held that the prosecutor's query, "Where is the evidence?," was not found to be error. Moreover, in this case there were numerous witnesses to these crimes, and appellant was not the only possible source of contradiction of the evidence. *Id.; Watts, supra,* 449 A.2d at 313.

 Appellant Bush also cites as misconduct the prosecutor's alleged expression of opinion about the truth of Sampson's testimony that the lineup was the fairest kind of identification procedure and that the witness, Dennis Applewhite, was a good citizen. He also contends that the prosecutor made an impermissible appeal for jury sympathy towards the prosecution for using John Williams as a government witness by stating that, "[h]opefully you won't be seeing him [Williams] in the streets in the near future." In examining these arguments, we must determine whether misconduct in fact occurred and, if so, whether the misconduct resulted in "substantial prejudice" to appellant's right to a fair trial. *Dyson v. United States,* 450 A.2d 432, 437 (D.C.1982). The test for determining substantial prejudice requires us to balance the gravity of the misconduct, its relationship to innocence or guilt of the accused, and the effect of any corrective measures taken by the trial court against the weight of the evidence of appellant's guilt. *Id.* at 437 (citing *Villacres v. United States,* 357 A.2d 423, 428 (D.C.1976)).

 We consider the remarks which appellant claims were improper. First, the single comment, allegedly an expression of personal opinion, that the government's witness did his best to tell the truth, does not rise to the level of the type of serious misconduct which can be viewed to have swayed the jury in this lengthy trial. *See Dyson, supra,* 450 A.2d at 438. Next, although the prosecutor is precluded from making arguments which appeal to the sympathy or passion of the jury, *see id.,* we do not regard the challenged remark about the witness Williams as one appealing to jury sympathy. Rather the remark tended to refute the idea that Williams' plea agreement was so advantageous that his testimony should be disbelieved solely because of it. In fact, Bush's attorney argued to the jury that John Williams received a good plea arrangement and asked rhetorically, "What would you give up if you were facing sixty years to the rest of your life?" Although the prosecutor's comment was somewhat speculative in implying that Williams would probably go to jail, it clearly does not rise to the level of reversible error, when its gravity is considered against the weight of the evidence of appellant's guilt.

 Appellant Bush also argues that the prosecutor attacked the integrity of his counsel during closing argument. This claim is based on two remarks made by the prosecutor. The first comment concerns an argument regarding the identification of Bush by Arthur Williams, a government

witness. During the trial, Williams had testified that he had seen a light-skinned man in the store just prior to the robbery. In closing argument, Bush's counsel attacked Williams' identification as unreliable. In response, the prosecutor recounted the questions and answers during trial by appellant's counsel regarding Williams' identification.[11] While doing so, he queried whether defense counsel could tell whether there was a light-skinned person in the lineup. The remark, though inappropriate, did not cast aspersions on appellant's counsel. It was not so egregious as to even evoke an objection. Viewed in context, the remark was insignificant and conveyed no clear meaning. Accordingly, we find no error, and certainly no plain error. *Bowler, supra,* 480 A.2d at 686–87.

### C. *Other Crimes Evidence*

■ Finally, appellant Bush argues that the admission of other crimes evidence so prejudiced his trial that reversal is required. The evidence involved consists of testimony of Barbara Singletary that she had seen appellant Bush with a gun in late January 1984. This does not constitute other crimes evidence. An accused's prior possession of the physical means of committing a crime is admissible. *Coleman v. United States,* 379 A.2d 710, 712 (D.C. 1977).

Appellant Bush also contends that the introduction of other crimes evidence during his trial counsel's cross-examination of Christopher Sampson requires reversal. During cross-examination, co-defendant Jackson's counsel elicited from Sampson that he and John Williams had committed a robbery together and that Sampson had made up the names of various individuals who helped him to rob various places. Counsel for Bush then cross-examined Mr. Sampson, including questions about the names of others with whom Sampson had committed unrelated robberies. While attempting to bring out the deceptiveness of Sampson's confession to the police about the various robberies and the people involved, the following exchange took place between the counsel for Mr. Bush and Mr. Sampson:

Q: So you were trying to be a bit deceptive when you talked to police?

A: Yes, sir.

Q: As a matter of fact you said at Northeast Liquor's Floyd Bush had a gun and that was a lie?

A: It wasn't a lie, it was more like—

Q: He didn't have a gun—

A: I committed so many robberies—

The court: Let him answer the question. What is the answer.

A: It was more like I committed a lot of robberies me and Floyd—

There was an objection by an attorney for one of the other co-defendants, and a bench conference ensued during which counsel for Bush requested a mistrial. The court was of the view that appellant Bush's counsel had led the witness into the problem, and the court declined to grant a mistrial. The court then instructed the attorneys to say no more about it, and none of the attorneys requested a curative instruction.

---

11. The challenged comment arose during the following part of the prosecutor's argument and is highlighted below:

[Defense counsel] asked him isn't your memory dimmer now than a year and a half? Mr. Williams said I was so scared my memory stayed with me quite a while. He talked for a long time. Remember that testimony and those questions? [Defense counsel] asked and about the sequents [sic] of how the identification took place. And what happened in [ ] my office when detectives Conway showed him the pictures and he said he recognized number 6.

Mr. Williams said he told the officer there and myself number 6 look like the guy who robbed Lee.

[Defense counsel] asked well, you had some doubt about that didn't you? Mr. Williams said not a whole lot of doubt. And [defense counsel] said you are not sure are you? And Mr. Williams said I'm pretty sure. I was worried about Lee, I was watching. well you are not one hundred percent sure [defense counsel] is asking but you are not one hundred percent sure but he resemble. *Well, [defense counsel], can you tell if there is a light-skinned man in the line-up?* And the [defense counsel] asked him about his rating which he used just as an aid to understand the certainty of the witness's identification.

When counsel for Mr. Bush resumed questioning Sampson, he asked whether or not his statement to the police that Floyd Bush had a gun during the Northeast Liquor Store robbery was a lie. The witness denied that it was. During the next series of questions, the defense counsel was able to elicit from Sampson that he had lied when he told the police that he had sold the murder weapon for $150 and that a person named Keith was involved in the robbery. Bush's attorney was also successful in getting Sampson to admit that he had falsely told the police that Bush had robbed a beauty salon on Fourteenth Street, N.W.

■ The government does not argue that the comment which provoked a mistrial motion was proper. Instead, it argues that any error was harmless. We agree. It has long been the rule that where a defendant does not take the stand or otherwise place his character in issue, evidence of prior criminal activity, with some exceptions, "is generally inadmissible because of its prejudicial impact." *Rindgo v. United States,* 411 A.2d 373, 376 (D.C.1980) (quoting *Jones v. United States,* 385 A.2d 750, 752 (D.C.1978)). Appellant relies upon *Rindgo* to support his claim of reversible error. In *Rindgo,* the government argued that the account of one of its witnesses during the government's case in chief concerning several robberies and attempted robberies carried out before and subsequent to the felony murder and robbery for which the defendant was on trial, was reversible error. The government argued that the testimony was necessary to demonstrate the association of Rindgo and the witness and the various criminal ventures in order to prove the probability that the two would have been together on the night of the crimes involved in the trial. *Id.* In that case, we concluded that the evidence was so prejudicial that it denied appellant a fair trial.

■ This case differs from *Rindgo* in several important respects. In *Rindgo,* the testimony was brought out by the government in its case-in-chief in order to prove criminal ventures between the government's witness and the defendant. In this

case, the portion of the testimony which prompted the mistrial motion was a brief reference to unspecified crimes which all counsel were instructed not to mention again. Nevertheless, apparently as a matter of strategy, and in an effort to demonstrate that the witness Sampson had lied to the police before about appellant Bush's involvement in other crimes, Bush's counsel elicited further testimony regarding at least two other robberies in which Sampson had implicated appellant. As to one of them, Sampson admitted that he lied about appellant's involvement. As to the other, Sampson stated that he had told the truth.

The remarks made just prior to the motion for mistrial, particularly in light of the tactic pursued by defense counsel, was not so significant during the course of a two week trial that denial of the mistrial motion was an abuse of discretion. *See Austin v. United States,* 433 A.2d 1081, 1085 n. 5 (D.C.1981). In *Austin,* the appellant had also brought out prior criminal conduct, and ample legitimate proof of appellant's guilt had been presented. *Id.* Therefore, we concluded in *Austin* that the claimed error was harmless. *Id.* Similarly, in this case we are persuaded that the trial court did not abuse its discretion in denying a mistrial because of the insignificance of the remark during the lengthy trial and appellant's own tactic of eliciting first Sampson's reports that Bush participated with him in other crimes and thereafter impeaching the witness. *See id.* Further, there was substantial proof of appellant's guilt, rendering any impropriety harmless. *See id.*

## V. *Dennis Jackson's Remaining Contentions*

Appellant Jackson argues that the trial court erred in denying his pretrial motion to suppress identification testimony and in admitting into evidence the in-court identifications of him made by eye witnesses to the robberies. In a pretrial motion, appellant moved to suppress the pretrial identifications of some of the witnesses made from a photographic array and from lineups conducted on July 18, 1984 and September 21, 1984 on the grounds that the com-

positions were unduly suggestive. Essentially, appellant makes the same claim on appeal with respect to the lineups.[12]

■■■■ A challenge to the admissibility of pretrial identifications requires a two part analysis: (1) whether the identification procedure was unnecessarily suggestive and conducive to irreparable misidentification, and, if so, (2) whether the identification resulting therefrom was reliable under the totality of the circumstances. *Henderson v. United States*, 527 A.2d 1262, 1267 (D.C.1987); *Stewart v. United States*, 490 A.2d 619, 622 (D.C.1985). In this case, the trial court, which viewed the relevant evidence, made findings that the identification procedures were not unduly suggestive. In reviewing appellant's claim, we are bound by the trial court's findings if they are supported by the evidence and consistent with the law. *Stewart*, 490 A.2d at 623. After reviewing the record, we find support for the trial court's conclusion with respect to both lineups. We find nothing in the lineup photos which would direct the witness' attention to a particular individual, which must be the subject of our focus. *See Henderson*, 527 A.2d at 1268; *McClain v. United States*, 460 A.2d 562, 566 (D.C.1983).[13]

Appellant also argues that, in any event, the identification testimony of the eyewitnesses against him was so weak and unreliable that they should have been excluded for lack of probative value. Having failed to prevail on the suppression motion, as occurred here, "[a] defendant may challenge the admission of such testimony by raising a timely objection to its admissibility at trial on the ground that under the law of evidence testimony is so inherently weak or unreliable as to lack probative value." *Sheffield v. United States*, 397 A.2d 963, 967 (D.C.1979), *cert. denied*, 441 U.S. 965, 99 S.Ct. 2414, 60 L.Ed.2d 1071 (1979). Since appellant did not raise the objection

at trial, we reverse only for plain error. *See id.* Under that standard, we will not reverse unless the error " 'jeopardize[s] the very fairness and integrity of the trial.' " *Id.* (quoting *Watts v. United States*, 362 A.2d 706, 709 (D.C.1976) (en banc)). Here, the record does not support a finding of plain error.

The reliability of an identification is predicated upon a number of factors, among which are "the ability of the witness to make a meaningful identification—the witness' opportunity to observe and the length of time of the observations, the lighting conditions, the length of time between the observations and the identification, the stimuli operating on the witness at the time of the observation, as well as the degree of certainty expressed by the witness in making the identification." *Beatty v. United States*, 544 A.2d 699, 701 (D.C.1988). Applying these factors to the account of the eyewitnesses whose identifications appellant Jackson challenges, we find no error, and clearly no plain error, as a result of their admission as evidence. We consider Jackson's challenge to each of those witnesses.

■■■ Appellant Jackson contends that the initial description of a witness to the Kovak's shooting, Reginald Reid, was vague and incomplete as compared with his in-court identification. Jackson argues that the identification should have been excluded, particularly because five months elapsed between the offense and the lineup. We disagree. Reid, a former military policeman, provided ample testimony of his concentration on the gunman (Jackson) with an unobstructed view and under good lighting conditions. Although less certain of the identification at the time of trial, Reid was quite positive in the few months after the offense when the lineup was conducted.

---

12. Appellant characterizes the lineup procedures for the July 18th lineup as unreliable, but he does not specify anything other than its undue suggestivity as a basis for that conclusion.

13. We reiterate, as we have so many times, that it is important for the trial court to make the

second inquiry, *i.e.*, if unduly suggestive, whether the resulting identification is reliable nonetheless. This procedure is necessary in the event this court should find that there was undue suggestivity. *See Henderson, supra*, 527 A.2d at 1269.

 Another witness to the Kovak's robbery, Errick Murdock, whose identification appellant also challenges, also testified that he had a clear view of appellant, and he told the police right after the robbery that he might be able to identify the gunman. Murdock examined several photo arrays in which appellant's photograph was not included and made no identification. This witness had no doubt when he selected appellant Jackson at the lineup, and he expressed 100 percent certainty at trial that appellant was the shooter.

The identification of Jackson as the gunman in the Sol's robbery by Alan Porter, the store manager, had sufficient indicia of reliability to preclude exclusion under *Sheffield, supra.* Porter testified that he concentrated on the gunman's face from a distance of three feet. When Porter chose Jackson at the lineup on September 24, he was between eighty and ninety percent sure of the identification. Porter's level of certainty at trial was also positive.

Margaret Peach, a witness at the Sol's robbery, was the least certain of her identification of appellant as the gunman. She testified that she watched the robbery from her seat behind the counter of Sol's Liquor Store and saw the left side of gunman's face. She described him as 5'7" or 5'8" having a small build, and a dark complexion. At the September lineup, she selected appellant Jackson as the person most closely resembling the gunman. At trial, she said the she would know the gunman if she saw him again, and thereafter testified that appellant "somewhat" looks like the person. Since this is not a single eyewitness case and Peach's testimony is merely cumulative, we are not persuaded that the admission of her identification is reversible error. *See Middleton v. United States,* 401 A.2d 109, 134 (D.C. 1979). Any weaknesses in Peach's testimony could be exposed on cross-examination and properly weighed by the jury in their evaluation of credibility. *See id.; see also Adams v. United States,* 302 A.2d 232, 234 (D.C.1973).

## VI.

For the foregoing reasons, the judgments of convictions appealed from by each of the three appellants hereby are

*Affirmed.*

SCHWELB, Associate Judge, concurring:

In my opinion, the government makes quite a persuasive argument for the proposition that the robbery counts relating to Northeast Liquors were properly joined with the robbery and felony murder counts relating to Kovak's Liquor Store. My colleagues disagree, holding instead that the counts were misjoined. Judge Wagner demonstrates, however, that the alleged error was harmless.

I agree with the majority that even if the judge's decision as to joinder was erroneous, the error was not prejudicial. Since all of the members of the division are of this opinion, the question whether the counts were properly joined is an academic one, and the rights of the parties are not affected by it. Accordingly, I would not reach that issue.

In all other respects, I join Judge Wagner's scholarly opinion for the court.